Gilford R. DUNCAN, Plaintiff-Respondent,

v.

E. Lynn KELLY, Defendant-Appellant.

No. 24888.

Kansas City Court of Appeals.

Missouri.

Dec. 2, 1968.

John I. Moran, Mason, Gant & Moran, Kansas City, for respondent.

CROSS, Judge.

Plaintiff pleads in this action that defendant offered to sell him twenty-five percent of the outstanding shares of common stock in a small corporation for the price of $3,000.00, that plaintiff accepted the offer and paid defendant that agreed sum, that defendant thereafter failed and refused to deliver to plaintiff any certificate of stock, and that plaintiff was thereby damaged to the extent of $3,000.00. Trial to a jury resulted in a verdict and judgment awarding plaintiff damages in the sum of $2,800.00. Defendant has appealed.

The corporation involved bears the name Triangle Texaco Service, Incorporated, and was created for the purpose of operating a neighborhood filling station. It was organized in January of 1963 by three original subscribers, namely, defendant Kelly, Mrs. Kelly and a Mr. Disney. A total of one hundred shares of common stock was issued —forty-nine shares to Disney, twenty-six shares to Kelly and twenty-five shares to Mrs. Kelly. On behalf of the Triangle corporation, Kelly had negotiated with Texaco, Incorporated, and obtained a lease of one of its filling station properties. The lease was taken in Kelly's name because of Texaco's policy that it would deal only with an individual directly responsible for the lease obligations. With that arrangement, Triangle proceeded to conduct a filling station business at the leased premises.

Plaintiff Duncan became acquainted with defendant Kelly in January of 1963, soon after Triangle began to operate the station, while patronizing it as a gasoline customer. Thereafter, according to Kelly, Duncan indicated that he would like to participate in "the business". "His interest was mild at first" and became "more emphatic as time went on." Finally, on July 31st, 1963, after indicating to Kelly and the other shareholders that he would like to "acquire an inter-

J. H. Birmingham, Jr., Birmingham & Furry, Kenneth E. Bigus, Kansas City, for appellant.

est", Duncan entered into an agreement with Kelly for that purpose. Meanwhile, and prior to that transaction, Disney and Mrs. Kelly had sold their respective share interests to other persons, thereby effecting a substantial change in the stock ownership. At the time the transaction was entered into, the corporate ownership was vested solely in defendant Kelly, a Mr. Schauble, a Mr. Anderson and a Mr. Abel.

On the last stated date, Duncan entered into an oral contract with Kelly to purchase twenty-five shares of stock in Triangle Texaco Service, Inc., for which he agreed to pay Kelly the sum of $3,000.00 in cash or check as the purchase price. Forthwith, Duncan delivered his check for $3,-000.00 to Kelly, payable to Triangle Texaco Service, Inc. Before the agreement was made and the transaction consummated, Duncan had examined a profit and loss statement at Kelly's home, and Kelly had advised him of the "financial situation" of the corporation. The check was deposited to Triangle's credit, and paid out as follows: $966.60 to station creditors; $1,800.00 to shareholder Anderson as partial payment on a $2,000.00 loan he had made to the corporation; $233.40 to Kelly, also as partial payment on loan of personal funds to the corporation he had previously made in the approximate amount of $4,000.00. Duncan admitted that such disposition of the purchase price increased the value of his "interest in the business" for which he had bargained.

Duncan testified that when he gave Kelly the $3,000.00 check he inquired about "the stock", and that Kelly said he'd take care of it in a day or two. Since Kelly held a certificate for twenty-six shares of stock, it was impossible for him to have delivered Duncan a certificate or certificates representing twenty-five shares (reserving a single share to himself) without the issuance of new stock certificates. Kelly testified that he informed Duncan that the corporate minute book, the stock transfer book and the corporate seal were in the possession of Mr. Cohn, the "corporate law-yer", who had originally been employed "to organize this business" and that he had not been paid for those services. Kelly testified "I told him (Duncan) that I didn't feel that we should call upon him (Cohn) to perform any further services until we were in a position to pay for service already rendered", and that he offered to sign over his stock certificate for twenty-six shares to Duncan to hold as evidence of his good faith in the transaction that had just been completed, but that Duncan said that would not be necessary. Duncan denied that such offer was made by Kelly and testified that in ensuing months he asked for "the stock" some five or six times but that he had never received it from Kelly. (Four days prior to trial defendant Kelly filed in the pending action the original certificate for twenty-six shares, duly assigned in blank, and during trial tendered it to plaintiff, who refused the tender.) After the transaction previously described was completed, it was understood that Kelly's remaining interest in the business amounted to a nine and one-third percent share, (represented by the single share reserved, together with additional stock acquired subsequent to organization of the corporation). Thereafter Kelly took no part in the operation of the business except to attend shareholders' meetings. In August, following the transaction consummated on July 31st, 1963, plaintiff was employed by Triangle as a part-time station attendant at a stated salary, and worked in that capacity until he became station manager under circumstances here noted.

Duncan testified that in February of 1964, when "the business was good", he purchased additionally the stock interest of Mr. Schauble amounting to thirty-seven and one-half percent of the total interest and thereby increased his "interest in the business" to sixty-two and a half percent. He received no stock certificate from Schauble to evidence the transaction, and admitted that he bought Schauble's interest "under these circumstances which you are complaining about now." Following that transaction, sometime later in February or early in

March of 1964, a stockholders' meeting was held. Prior thereto other changes had been made in ownership of the stock interests held, so that at the time of the meeting, the roster of stockholders included Duncan, Kelly, Schauble, a Mr. Hunter and a Mr. Rankin. At the meeting new corporate officers were named, including Duncan who was elected president "since he held the largest part". Thereafter Duncan assumed management of the station and operated it until it was finally closed. During that time all company records were available at the station except the corporate minute books, seal, and transfer book which the corporate lawyer still held. Records kept at the station included those showing daily sales and purchases, and charges and receipts. Duncan testified that as principal officer of the corporation and manager of its station property, he was signing documents as president of Triangle Texaco Service, Inc., that he had access to the bank account, that he deposited and withdrew money from it, and had authority to draw checks upon it. Duncan "continued to operate it (the business) until it went broke". On April 3, 1964, approximately forty-five days after he became president, Duncan finally closed and locked the station. According to Duncan, the stock "is worth nothing now after it went broke".

Duncan admitted that "all of the parties involved * * * recognized your (his) interest"; "that nobody ever contested your (his) interest in the corporation", that neither Kelly, Schauble, nor any one else ever interfered with his operation of the business, and that Kelly and Schauble assisted him if he asked for assistance.

It was explained by Kelly that all of the transactions between the various individuals involving the sale and transfer of corporate ownership were done without any actual transfer or delivery of stock certificates, but by mutual understanding of the parties involved. Kelly stated that the three original certificates issued to himself, his wife, and Mr. Disney, were the only certificates ever issued, and that he still had them in his possession. Kelly stated that "at any meetings, the percentages of ownership were clearly understood by all individuals involved; never any question raised." Duncan declined to say that it was Mr. Kelly's fault "because he lost money in the business." No person had ever offered to purchase Duncan's stock interest and there is no evidence that he had tried to sell it. Duncan makes no claim that Kelly practiced any fraud to induce the transaction between the parties. It is not shown that any dividend or profit was ever distributed to any shareholder.

As appellant, Kelly now contends that the trial court erred in refusing to direct a verdict in his favor because (1) the evidence established that Duncan did in fact receive a 25% interest in the corporation even though he received no certificate and (2) he "failed to allege or prove how he was damaged by not receiving a stock certificate." Secondarily, the appealing defendant submits that the trial court erred in giving instructions submitting the issue of damages to the jury "because plaintiff has not alleged or proven either the amount or nature of such damage."

■ An understanding of the issues requires that we distinguish between a "share of stock" in a corporation and a "stock certificate", as those terms are understood by the courts. A "share" of stock connotes actual, beneficial, participating ownership or interest in a corporation, whereas a "certificate" for stock is no more than a document evidencing such ownership or interest. This distinction is made in 18 Am.Jur.2d, Sec. 209, page 737, as follows:

"A share of stock is a unit of interest in a corporation. While ownership thereof confers no immediate title to any of the property of the corporation, it entitles the shareholder to an aliquot part of the property, or its proceeds, to the extent indicated, when distributed according to law and equity. Each share represents a distinct and undivided share or interest in the common property of the corporation.

"Shares of stock constitute property distinct from the capital or tangible property of the corporation and belong to different owners. The capital is the property of the artificial person, the corporation, the shares of stock are the property of the several shareholders. Incorporeal in their nature, the shares are personal property, being frequently so declared by statute. As such, they may be the subject of sale, mortgage, or pledge, like other personal property. Public policy does not forbid one party to hold the legal title, and another party the equitable title, to stock.

"Shares of stock are generally regarded as choses in action, or at least in the nature of choses in action, although they do not constitute an indebtedness of the corporation to the shareholders.

"Shares of stock and certificates for shares of stock are different legal entities. A share of stock is the actual property of the shareholder. The stock certificate on the other hand is merely the evidence of a membership * * an attestation of the stockholders' ownership of shares."

Missouri decisions reflect the foregoing stated principles. In Hayes v. St. Louis Union Trust Co., 317 Mo. 1028, 298 S.W. 91, 56 A.L.R. 1276, "shares of stock" are stated to be "units of interest in the corporation, as conducted by its directors, officers, and * * * shareholders." In Vanstone v. Goodwin, 42 Mo.App. 39, this court said a "share" of stock is "a species of incorporeal, intangible property in the nature of a chose in action", but that a "certificate" of stock is "a muniment of title". We further said that "the title to the shares may exist without the certificate, the certificate being only the evidence of the title of the

shareholders." Also see Mitchell v. Newton County Bank, 220 Mo.App. 223, 282 S.W. 729. Missouri courts have also held uniformly that the issuance of a certificate is not essential to constitute one a stockholder, Williams v. Everett, Mo.Sup., 200 S.W. 1045; that "title to shares of corporate stock may exist without the certificate, the certificate being only the evidence of the title of the shareholder", Vanstone v. Goodwin, supra; and that a certificate is not the only evidence of stock ownership, Estel v. Midgard Inv. Co., Mo.App., 46 S.W.2d 193.

■ However, notwithstanding the fact that a stock certificate is not of and in itself the owners "property" or ownership interest in the corporation, but is merely evidence thereof, it is generally recognized that the certificate, as a symbol, or paper evidence of the stock ownership, is *tangible* personal property, with some value in itself as a transferable symbol of property and as evidence of the holder's right and title as a stockholder. 18 C.J.S. Corporations § 258, p. 723.

■ At all times mentioned in the evidence, the Uniform Stock Transfer Law was in effect as Chapter 403, V.A.M.S., 1959.[1] Section 403.050 of that act entitled "How title to certificates and shares may be transferred," provides in part as follows:

"Title to a certificate and to the shares represented thereby can be transferred only

1. By delivery of the certificate endorsed * * * or

2. By delivery of the certificate and a separate document containing a written assignment of the certificate * * or

---

1. Repealed by Missouri Uniform Commercial Code enacted by legislature in 1963, to be effective as of July 1, 1965. Section 400.10–101 of the Code provides: "Transactions validly entered into before July 1, 1965 and the rights, duties and interests flowing from them remain valid thereafter and may be terminated, completed, consummated or enforced as required or permitted by any statute or other law amended or repealed by this chapter as though such repeal or amendment had not occurred."

3. By delivery of the certificate with an assignment (by certain fiduciaries) * * *".

Respondent Duncan attempts to argue that the foregoing provisions are to be interpreted as a bar to the transfer of stock *ownership* as distinguished from its *title,* without delivery of the certificate in the manner prescribed. We do not so interpret Section 403.050. Its terms are literally restricted to subject matter involving legal title only and in no sense embrace the broad field of equitable rights and interests and the method of their transfer. In fact, the act itself contains a further provision which specifically protects and insures the enforcement of contract rights and obligations arising from transactions wherein the parties undertake, to transfer "shares" of stock without "delivery of the certificate." We refer to Section 403.140 which reads as follows:

"An attempted transfer of title to a certificate or to the shares represented thereby without delivery of the certificate shall have the effect of a promise to transfer and the obligation, if any, imposed by such promise shall be determined by the law governing the formation and performance of contracts."

Our concept of Section 403.050 is supported by the Missouri case, East v. Crowdus, 302 F.2d 645, decided finally by the U. S. Court of Appeals for the Eighth Circuit. The court ruled in that case as follows: "Hence, even where there is an ineffective transfer of legal title to certificates and shares of stock as provided in Section 403.-050, supra, equitable title thereto may be acquired and compel such a transfer. Cf. Orpheum Building Company v. Anglim, 127 F.2d 478 (Cir. 9, 1942); Martindell v. Fiduciary Counsel, 133 N.J.Eq. 408, 30 A.2d 281 (1943); Johnson v. Johnson, 300 Mass. 24, 13 N.E.2d 788 (1938); State ex rel. Fulton v. Arrowhead Inv., Inc., 64 Ohio App. 251, 28 N.E.2d 797 (1940)."

■ We are able to dispose rather summarily of Kelly's contention that he was entitled to a directed verdict. The fundamental issue in the case was whether Kelly breached his agreement to deliver twenty-five shares of corporate stock to Duncan, for the purchase price of $3,000.00. Regardless of whether Duncan received from Kelly the equitable and beneficial ownership of the stock, and enjoyed all corporate privileges connected therewith, (as the evidence all strongly indicates), the fact is indelibly written in the record that *Kelly did not vest Duncan with any tangible muniment of title by delivering him a certificate of stock.* We believe that such a duty was incumbent on Kelly as a condition inherent in the agreement, and as the culminating act necessary to formally complete the transaction. Having admittedly failed in that duty, Kelly must be held as a matter of law to have breached the agreement, *at least in a technical sense,* even though it be assumed that the evidence conclusively established that Duncan had become the equitable owner of the stock. The trial court would have erred had it directed a verdict in Kelly's favor.

■ Plaintiff Duncan is at least entitled to recover nominal damages in this case. "Surely it requires no citation to support the statement that in actions for breach of contract, proof of the contract and of its breach give rise to nominal damages regardless of whether actual damages were suffered or not. The cases are collected in the Missouri Digest, Vol. 10, Damages, ☞8 and 9. If the contract and its breach are substantiated by the evidence, nominal damages necessarily follow." Hotchner v. Liebowits, Mo.App., 341 S.W.2d 319. It is equally fundamental that Duncan is not entitled to recover more than nominal damages unless he has adduced evidence to establish that he has sustained an actual, substantial loss or injury. As stated in 22 Am. Jur.2d, Damages, Sec. 24, page 43, (with reference to the recovery of compensatory damages): " * * * (A) plaintiff cannot recover damages by proving only that the defendant has unlawfully violated some duty owing to the plaintiff, leaving the trier

of fact to speculate as to the damages; he must go further and prove the nature and extent of the damage suffered by the plaintiff and that the breach of duty was the legal cause of that damage. Leaving either of these damage questions to speculation on the part of the trier of fact will prevent recovery. Therefore, no recovery can be had in those cases in which it is uncertain whether the plaintiff suffered any damage." Also see Judson Roberts Company, Inc. v. Seaboard Allied Milling Corporation, Mo. App., 435 S.W.2d 26.

The only complaint Duncan has made, either by way of pleading or evidence, is that he was damaged by not receiving a stock certificate. There is nothing in the record to show the nature or extent of the damages he claims to have received by reason of Kelly's failure to deliver such instrument, or even to show that he suffered any actual compensable damages at all for that reason. If Kelly had delivered the certificate, Duncan would not have received any benefit, privilege or profit that he did not have without it. His aliquot share interest in the corporation was fully recognized by his fellow shareholders. In addition to his salary as president of the corporation and manager of its business enterprise, he was accorded and exercised all perquisites to which he was entitled as the majority stockholder. As Triangle's chief officer he had custody of and access to its corporate records, money and bank account. He operated the corporation's business without interference, and received assistance from other stockholders when he asked for it. He lost no opportunity to sell his stock, because no one ever offered to purchase it and he never tried to sell it. As befell the lot of all the shareholders, Duncan received no dividends because the corporation made no profit.

Whatever, or whoever, is responsible for the failure of the Triangle Corporation, the fact remains, (as the evidence shows) that Duncan has had the fruits of his bargain, bitter as they may be, but that he suffered no compensatory damage for lack of a stock certificate to symbolize the actual property interest he took and enjoyed.

We therefore conclude that there was no substantial evidence to support the jury's award of damages to plaintiff, other than nominal damages, that the trial court erred in submitting the issue of compensatory damages to the jury, and that the trial court in the proper exercise of its judicial function should have directed the jury to return a verdict in favor of plaintiff for nominal damages.

Accordingly, we reverse the judgment and remand the cause with directions to the trial court to enter a new judgment providing that plaintiff have and recover of defendant the sum of One Dollar ($1.00), together with his costs, and that he have execution therefor.

All concur.