Vance K. GOVER, Kenneth E. Johnston, Tom B. Kretsinger, Warren H. Sapp, and William H. Tate, Plaintiffs-Appellants,

v.

EMPIRE BANK, a Banking Corporation, Defendant-Respondent.

No. 10034.

Missouri Court of Appeals, Springfield District.

Nov. 17, 1978.

Motion for Rehearing or to Transfer Denied Dec. 6, 1978.

Application to Transfer Denied Jan. 8, 1979.

Tom B. Kretsinger, Warren H. Sapp, Kansas City, for plaintiffs-appellants.

J. Douglas Cassity, Springfield, for defendant-respondent.

Before BILLINGS, C. J., and STONE and TITUS, JJ.

STONE, Judge.

In this court-tried action, plaintiffs-appellants Gover, Johnston, Kretsinger, Sapp and Tate, who were "at all times relevant herein" members of the board of directors of Refrigerated Food Lines, Inc. (RFL), sought a decree cancelling a "Loan Guaranty Agreement" dated June 9, 1971, admittedly executed by each plaintiff individually, which guaranteed payment to defendant-respondent Empire Bank of Springfield, Missouri (Empire), "of any and all indebtedness, liabilities and obligations of every nature and kind of said (RFL) to (Empire), and every balance and part thereof, whether now owing or due, or which may hereafter, from time to time, be owing and due, and howsoever heretofore or hereafter created or arising or evidenced, to the extent of Sixty Thousand Dollars . . . ." By initialed handwritten interlineations of the printed guaranty agreement (Empire's ex. 1),[1] the liability of *each of four* individual signatory directors, namely, M. G. (Gene) Rippey,[2] Vance K. Gover, Kenneth E. Johnston and William H. Tate, was limited to *20%* of any sum payable under the guaranty agreement, and the liability of *each of the*

---

1. A photographic copy of Empire's ex. 1 is appended to this opinion.

2. Rippey, the "president and chief executive officer" of RFL, "who [had] lived in Springfield and operated the company on a day-to-day basis," was neither a party in this action nor a witness upon trial. Plaintiffs' counsel informed the court that "Mr. Rippey will not be here, sir.

*other two* individual signatory directors,[3] Tom B. Kretsinger and Warren H. Sapp, was limited to *10%* of any such sum.[4]

In due time, defendant-respondent Empire answered and also counterclaimed for the unpaid principal balances owing by RFL upon notes held by Empire, and for interest thereon and attorney's fees. At the conclusion of a plenary trial, the court took the case under advisement, requested written suggestions from opposing counsel, and in due time entered judgment embracing, inter alia, (1) a general finding of the issues for defendant Empire on both plaintiffs' petition and defendant's counterclaim, (2) a finding that after Empire "realized on" all available collateral securing its loans to RFL, "there was a deficiency" of $27,019.26, accrued interest thereon of $5,586.98 to the date of judgment, and (as provided in the guaranty agreement) a reasonable attorney's fee of $4,890.93 (15% of the principal and accrued interest), and (3) in accordance with the guaranty agreement, "an individual judgment" against each of three plaintiffs, Gover, Johnston and Tate, in the sum of $7,499.43 (20% of the above "deficiency," accrued interest and attorney's fee), and against each of the other two plaintiffs, Kretsinger and Sapp, in the sum of $3,749.72 (10% of the "deficiency," interest and attorney's fee), all of those "individual judgment[s]" aggregating $29,997.74.

RFL was a Missouri corporation "reorganized under that name" in May 1969, based in Springfield, and engaged in the interstate "hauling [of] swinging meat from the midwest to the southeast" in refrigerated trailers. Rippey, the only director residing in Springfield was "president and chief executive officer" of RFL and "operated the company." At the time of reorganization, "a number of personal guaranties" (not here involved or in issue) were executed by RFL's shareholders-directors who guaranteed repayment of a substantial loan by Empire "on the [operating] rights."

Empire's evidence was that shortly after reorganization, to wit, under date of July 10, 1969, Rippey delivered to Empire a copy of resolutions of RFL's corporate board certified by Rippey as president, his wife as assistant secretary, and his brother-in-law, Howard A. Wood, Sr., then a member of the board, which authorized the "[p]resident" to "[n]egotiate and procure loans from The Empire Bank," give security therefor, and "[e]xecute in such form as may be required by the bank all notes and . . . instruments of pledge, assignment or lien . . ." On the other hand, plaintiffs herein denied that the board of directors authorized or adopted that resolution.

However that may have been, in July 1970 Rippey, as president and on behalf of RFL, entered upon a course of frequently borrowing from Empire on collateral notes, each of which was secured by the assignment of accounts receivable itemized in an attached list showing as to each account RFL's invoice number, the name and address of the buyer-consignee, and the amount owing on that invoice. Empire also received a carbon copy of the freight bill for each such shipment. On the accounts receivable thus assigned, Empire loaned 80% of the amount billed. No notice of such assignment was given to any consignee; but the agreement between RFL's Rippey and Empire's Stewart, then vice president in charge of Empire's commercial loan department, was that, as remittances on these assigned accounts were received by RFL, they would be delivered to Empire and credited on the respective notes for which they were specifically assigned. Empire made twenty such loans to RFL during the period from July 29, 1970, to May 24, 1971, but RFL's indebtedness at the time of suit was for unpaid balances on the last

---

I guess he's unavailable. We're not sure where he is."

**3.** At all times here material, there were only six directors.

**4.** These interlineations were made by plaintiff Sapp at a meeting of RFL's board of directors in Sapp's Kansas City law office without Empire's prior knowledge, but witness Stewart, a vice president in Empire's commercial loan department, testified that the limitations thereby effected were "acceptable" to Empire.

four notes, to wit, those dated on the 10th, 14th, 19th and 24th days of May, 1971, respectively.

In reviewing between May 24 and June 1, 1971, "the overall situation" as to Empire's loans to RFL, Stewart observed that Rippey had been "coming in a little more frequently," that "[t]he last time or two, he was really pressed for funds," that in April 1971 RFL's application for a $100,000 S.B.A. loan had been denied, and even more significantly and importantly that some remittances in payment of *later* assigned accounts of certain consignees had been forwarded by Rippey to Empire whereas remittances in payment of *earlier* assigned accounts of the same consignees had *not* been received by Empire. Confronted with this last–noted circumstance, Rippey tendered the belated confession that "I need[ed] some operating capital" and "I just didn't bring them in." Whereupon, in the same discussion Stewart told Rippey that "if we don't have a guaranty on this, we'll just call our loans and pick up your receivables and collect the money and see where we do stand."

Facing this financial crisis, RFL's board of directors (with all of the six members in attendance) convened in the Kansas City law office of directors Kretsinger and Sapp on Wednesday, June 9, 1971. No representative of Empire was present. Three directors, namely William H. "Bill" Tate who "operated a cheese plant" at Hannibal, Missouri, Kenneth Johnston who was "general transportation manager" for a cheese plant in Clinton, Missouri, and attorney Sapp, testified at length concerning the discussion and action taken at that meeting; and, over timely objections, those three directors were permitted to relate that Rippey had then told the board no money had been theretofore borrowed on RFL's accounts receivable. Whatever may have been said in that meeting, the end product was the guaranty agreement executed in the language and form of the appended copy, which on the following day, June 10, was delivered by Rippey to Stewart at Empire. According to Sapp, Rippey called that same day and declared that Empire "had turned down another loan" but "had kept the guaranty."

On Saturday, June 12, directors Sapp, Gover, Johnston and Tate came to Springfield and met with Empire's Stewart, who fully informed them concerning loans made by Empire to RFL "against accounts receivable." Referring to the directors' reaction to this information, Sapp commented that "[o]bviously, the company [RFL] was in much worse financial condition than we had been led to believe." However, we observe that elsewhere in the course of his testimony Sapp conceded that "when Mr. Rippey came to the board meeting on June 9 . . . the company [RFL] was in a bad financial situation." Sapp also revealed (a) that on June 9, RFL was indebted in the sum of "about" $100,000 on the note executed to acquire the funds for purchase of the operating rights and (b) that RFL "had had continuing cash problems" which had become "critical about . . . the end of March" 1971 when it became necessary to finance a substantial portion of a large insurance premium.

On several occasions during the period from June 12 to July 16, Sapp conferred in Springfield not only with Empire's Stewart but also with James DeBerry and M. G. West, then senior vice-presidents of Empire. When, in the course of direct examination by his cocounsel Kretsinger (likewise a signator on the guaranty agreement), Sapp was asked "did you ever tell any officials of the bank [Empire] that the guarantors or the directors who signed this guaranty would not honor this guaranty," Sapp replied "[y]es, I did"; and, to the succeeding request that he "tell the circumstances," he responded thusly:

"This would have been during, I think, the first two weeks of July. I met, I know, with Mr. Stewart and Mr. DeBerry. Now Mr. DeBerry and I were trying to figure out some acceptable manner of keeping the company in business, and satisfying the bank, and I had not brought this up before because we were trying to work with the bank and cooperate with them. But over coffee, after one of these meetings, I told Mr. DeBer-

ry, 'You know—you know that if it comes to the hard questions, we're going to have to contend that we aren't bound by this guaranty. We won't pay anything on it.' "

On July 16, Empire closed RFL's checking account and exercised its right of setoff. To afford sufficient time for completion of an audit by one Preston, an independent CPA employed by RFL, Empire took no further action until the evening of July 29, when RFL voluntarily "turned over" all of the accounts receivable to Empire. The unpaid balances of those accounts receivable then aggregating $47,897.09 were reduced to $27,019.26 by Empire's subsequent collection efforts.

■ The sole "Point Relied On" in plaintiffs-appellants' brief is that "[t]he judgment of the Circuit Court is erroneous in that respondent [Empire] failed, on its counterclaim, to establish any consideration for the alleged guaranty." Since our appellate review is limited to those issues presented and preserved in "Points Relied On," we attend only that quoted complaint [*Pruellage v. De Seaton Corporation*, 380 S.W.2d 403, 405(3) (Mo.1964); *Brewer v. Blanton*, 555 S.W.2d 381, 383(1) (Mo.App. 1977); *Del Monte Corp. v. Stark & Son Wholesale, Inc.*, 474 S.W.2d 854, 857(2) (Mo. App.1971)] and the facts materially relevant to resolution of that complaint.

■ As we view the case, certain factors impel rejection of plaintiffs' above-quoted complaint. In the first place, the initial recitation in the guaranty agreement, to wit, "For Value Received," is prima facie evidence of consideration to support that agreement. *Burrell v. Kaiser's Estate*, 344 S.W.2d 622, 626–627(6) (Mo.App.1961); *Gershon v. Ashkanazie*, 239 Mo.App. 1012, 1023–1024, 199 S.W.2d 38, 46(5–7) (1947); *J. R. Watkins v. Smith*, 31 S.W.2d 544, 546(4) (Mo.App.1930); 17 C.J.S. Contracts § 73, pp. 756–757; 17 Am.Jur. Contracts § 90, pp. 432–433.

Furthermore, § 431.020, RSMo 1969, VAMS, provides that:

"All instruments of writing made and signed by any person or his agent, whereby he shall promise to pay to any other . . . any sum of money . . . shall import a consideration, and be due and payable as therein specified."

In their reply brief, plaintiffs' counsel recognize as a "generally correct statement of the law," that "the recital of consideration appearing in the guaranty document ('For value received . . .'), standing alone, is sufficient to support the alleged agreement without further proof of a consideration." However, they endeavor to avoid the inescapable effect of that admission (which was mandated by the applicable legal principle) by charging that "respondent [Empire] appears to argue that the recital raises, in effect, a *conclusive* presumption of consideration which may not be rebutted." (Emphasis ours) We do not so construe defendant-respondent's brief, considered in its entirety; but, that brief aside, it is clear that a recital of consideration does *not* give rise to an *irrebuttable* presumption. Rather, the effect of the phrase "[f]or value received" was to create a presumption which, though not conclusive, was sufficient to support the guaranty agreement, if such presumption was not overcome to the satisfaction of the trial court, by acceptable and persuasive evidence to the contrary.

■ The concession in plaintiffs' reply brief that "proof of consideration is not necessary by an *obligee* bringing action on a written agreement which imports a consideration" is in harmony with, and in fact is required by, the relevant and controlling statute [§ 431.020]. On the other hand, we recognize (as do plaintiffs) that where, as here, the *obligors* assert that there was "a want or failure of consideration," such assertion must be pleaded and proved as stated thusly in *Gershon v. Ashkanazie*, supra, 199 S.W.2d at 46(7), cited by plaintiffs in this connection:

"If the maker of any such instrument denies the existence of a lawful consideration therefor, the provisions of . . . [now § 431.020] and the judicial interpre-

tations thereof, together with the recitals in the instruments themselves that they were made for value received, emphasize the necessity of the maker to establish his claim by a clear preponderance of credible evidence, and his proof must be cogent and convincing."

■ In attempting to carry their burden of proof on the issue raised by them as to alleged want of consideration, plaintiffs were permitted to testify fully and therefore have no basis for complaint here that they were foreclosed from presenting their evidence on that issue. However, counsel for plaintiffs-appellants have overlooked the axiom that in a court-tried case the trial judge is the arbiter of the facts and may disbelieve and reject any portion of the oral testimony, even though the rejected portion is uncontradicted. *Miller v. Gayman*, 482 S.W.2d 414, 419(7) (Mo.1972); *Intertherm, Inc. v. Coronet Imperial Corp.*, 558 S.W.2d 344, 348(3) (Mo.App.1977); *Labor Discount Center, Inc. v. State Bank & Trust Co. of Wellston*, 526 S.W.2d 407, 421(4) (Mo.App. 1975).

■ Our review in this court-tried case is "upon both the law and the evidence as in suits of an equitable nature" with "[d]ue regard . . . to the opportunity of the trial court to have judged the credibility of witnesses" [Rule 73.01, subd. 3, ¶¶ (a)(b)];

and, it becomes our appellate duty to sustain the judgment nisi unless no substantial evidence supports it, or it is against the weight of the evidence, or it erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32(1) (Mo.banc 1976); *McGee v. St. Francois County Savings and Loan Ass'n.*, 559 S.W.2d 184, 186(1) (Mo.banc 1977); *McFarland v. Braddy*, 560 S.W.2d 259, 261(1) (Mo.App.1977).

■ As respondent here, defendant Empire is clothed with the presumption that the judgment under review is correct, and the burden rests upon plaintiffs-appellants to establish affirmatively any alleged error. *Hardy v. McNary*, 351 S.W.2d 17, 20(2) (Mo. 1961); *James v. James*, 248 S.W.2d 623, 627(8) (Mo.1952); *Crossgates Home Ass'n. v. Blomquist*, 537 S.W.2d 429, 430(1) (Mo. App.1976); *Pallardy v. Link's Landing, Inc.*, 536 S.W.2d 512, 515(2) (Mo.App.1976).

■ Sympathetically attuned as our ear may be to plaintiffs' plea ad misericordiam, a meticulous review of the transcript and briefs with appropriate regard for the foregoing principles of appellate review in a court-tried case constrain the conclusion that the judgment nisi should be affirmed in all respects. It is so ordered.

BILLINGS, C. J., and TITUS, J., concur.
[See following illustration.]

*Dep'ts Ex. 1 — 7-13-74 AK*

## LOAN GUARANTY AGREEMENT

**For Value Received** and to enable REFRIGERATED FOOD LINES, INC.

of SPRINGFIELD, MISSOURI , nereinafter designated as "Debtor," to obtain credit, from time to time, of EMPIRE STATE BANK , we hereby request said Bank to extend to said Debtor such credit as said Bank may deem proper, and we hereby, and hereby jointly and severally guarantee the full and prompt payment to said Bank at maturity, and at all times thereafter, and also at the time hereinafter provided, of any and all indebtedness, liabilities and obligations of every nature and kind of said Debtor to said Bank, and every balance and part thereof, whether now owing or due, or which may hereafter, from time to time, be owing or due, and howsoever heretofore or hereafter created or arising or evidenced, to the extent of

SIXTY THOUSAND ———————————————Dollars,

and we jointly and severally also agree to pay in addition thereto, all costs, expenses and reasonable attorney's fees at any time paid or incurred in endeavoring to collect said indebtedness, liabilities and obligations, and in and about enforcing this instrument, to the extent our respective indebtedness.

All diligence in collection, and all presentment for payment, demand, protest, notice of protest, and notice of non-payment, dishonor and default, and of the acceptance of this guaranty, and of any and all extensions of credit hereunder, are hereby expressly waived.

The granting of credit from time to time by said Bank to said Debtor in excess of the amount of this guaranty and without notice to the undersigned, is hereby authorized and shall in no way affect or impair this guaranty.

Authority and consent are hereby expressly given said Bank from time to time, and without any notice to the undersigned, to give and make such extensions, renewals, indulgences, settlements and compromises as it may deem proper with respect to any of the indebtedness, liabilities and obligations covered by this guaranty, including the taking or releasing of security and surrendering of documents.

In case of the death, dissolution, liquidation, failure, insolvency or bankruptcy of said Debtor, all of said indebtedness, liabilities and obligations, to the extent of the amount of this guaranty, shall, at the option of said Bank, become immediately due from, and be forthwith paid by the undersigned to said Bank, the same as though said debts, liabilities and obligations had matured by lapse of time.

This guaranty shall be construed according to the laws of the State of MISSOURI , in which state it shall be performed by the undersigned.

This guaranty shall be binding upon the undersigned jointly and severally, and upon the heirs, legal representatives and assigns of the undersigned, and each of them, respectively, and shall inure to the benefit of said Bank, its successors, legal representatives and assigns.

Signed and Sealed by the undersigned, at Kansas City, Mo. this NOT FILED

day of JUNE , 19 71

JAN 27 1972

WILLIAM C. COCK____

MISSOURI COURT C___ Spring___

_____ (SEAL) 20%

_____ (SEAL) 20%

Kenneth E. Johnston (SEAL) 20%

William H. Joss (SEAL) 20%

_____ (SEAL) 10%

Werner H. Sapp (Seal) 10%

WITNESSES