603 F.Supp. 847 (1985)
Michael CROW, Barbara Crow, Plaintiffs,
v.
NEWSPAPER DEALER SUPPLY, INC., Dennis W. Ramsey, Defendants.
No. 83-0986C(3).
United States District Court, E.D. Missouri, E.D.
February 7, 1985.
*848 Martin P. Zucker, Peper, Martin, Jensen, Maichel & Hetlage, St. Louis, Mo., for plaintiffs.
Eric J. Snyder, St. Louis, Mo., for defendants.

MEMORANDUM
HUNGATE, District Judge.
This matter is before the Court for a decision on the merits on the claim of plaintiffs, Michael and Barbara Crow, against defendants, Newspaper Dealer Supply, Inc., and Dennis Ramsey. Plaintiffs bring this action to recover on a promissory note executed by defendants. Defendants assert various defenses, and counterclaim for breach of contract and fraud.
The Court held a nonjury trial in this cause on September 17, 1984, allowing the parties a full opportunity to present evidence.
Having carefully considered the pleadings, trial testimony, exhibits, stipulations, and memoranda of the parties, and being fully advised in the premises, the Court hereby makes and enters the following findings of fact and conclusions of law.

Findings of Fact
1. Plaintiffs, Michael and Barbara Crow, are citizens of the State of Illinois and residents of DuPage County, Illinois.
2. Defendant, Newspaper Dealer Supply, Inc. (Newspaper Dealer Supply), is a corporation incorporated under the laws of the State of Missouri and a resident of St. Louis County, Missouri.
3. Defendant, Dennis W. Ramsey, is a citizen of the State of Missouri and a resident of St. Louis County, Missouri.
4. Nike Plastics Company (Nike) was a manufacturer of plastic film and bags located in Missouri and employing approximately forty persons.
5. On or about July 1, 1978, Michael Crow left the employ of a company that sold plastic products similar to those manufactured by Nike, moved from Michigan to Missouri, and entered into an employment contract with Nike as a salesman and marketing specialist.
6. Jerome Stan, the president of Nike, signed the employment contract on behalf of Nike which provided for a stock purchase agreement whereby Crow could purchase up to ten shares of Nike's common stock for a total of $2,000.00 per share.
7. On or about September 25, 1978, Crow paid $7,500.00 to Nike by personal check which entitled him to three and three-quarters shares of Nike stock according *849 to the terms of the stock purchase agreement. On or about January 27, 1979, Crow paid $5,000.00 to Nike by personal check for an additional two and one-half shares of Nike stock.
8. Between July 1, 1978, and January of 1979, Crow incurred business related expenses in the amount of approximately $2,500.00 for which Nike did not reimburse him as required by the employment contract. Crow entered into an oral agreement with Stan on behalf of Nike whereby he would be entitled to one and one-quarter additional shares of stock in lieu of reimbursement.
9. At no time were stock certificates or securities issued to Crow to represent the number of shares owned by him, nor were any such certificates requested by Crow.
10. In early 1979, Dennis Ramsey was president of Newspaper Dealer Supply which was Nike's largest customer. Nike was also the sole supplier of plastic bags to Newspaper Dealer Supply.
11. Nike's financial situation deteriorated throughout 1978 on into 1979, losing money during virtually every month during that period. On occasion, customers were required to guarantee Nike's raw material purchases to insure the manufacture of products they purchased from Nike. Newspaper Dealer Supply advanced money to Nike for raw materials, outstanding bills and payroll expenses, and those amounts were credited to Newspaper Dealer Supply's account with Nike.
12. By early 1979, Nike's financial position was so poor that capital contributions had been depleted and the shareholders were no longer willing to make additional investments to keep Nike afloat.
13. In early 1979, Ramsey entered into negotiations with officers of Nike including Stan concerning the possibility of Ramsey and Newspaper Dealer Supply gaining control of Nike to keep it from closing.
14. On March 12, 1979, a meeting of members of the board of directors and shareholders of Nike was held in Chicago, Illinois, for the purpose of reorganizing Nike so that Ramsey would own one-half of all Nike shares and be elected to the board of directors. All other shareholders had agreed to reduce the number of shares they held so as to accommodate Ramsey, and in return Ramsey was to infuse capital and equipment into the faltering company.
15. According to a resolution of the board of directors dated March 13, 1979, and signed by Ramsey as a member of the board of directors, Ramsey became owner of one-half of all the outstanding shares of Nike and the amount of stock owned by Crow was reduced from seven and one-half shares to six and three-quarters shares. All the other shareholders had their shares reduced also, and none have been heard to complain. No certificates of stock were issued to Ramsey, Crow, or any of the other stockholders.
16. Between March 13 and March 30, 1979, Ramsey entered discussions with Crow regarding the possibility of purchasing Crow's stock. It was Ramsey's intent to gain control of Nike by owning more than fifty percent of the outstanding shares.
17. On March 30, 1979, Newspaper Dealer Supply, by its president, Ramsey, and by Ramsey individually, executed a promissory note payable to the order of the Crows as joint tenants with right of survivorship, in the amount of $15,000.00.
18. The note executed by the defendants recited value received and called for installment payments of $500.00 per month commencing on April 15, 1979, and continuing thereafter until the entire sum was paid in full. The promissory note provided that if any installment was not paid when due, the entire balance of the note would, without notice, become immediately due and payable at the option of the holder and would bear interest at the rate of ten percent per annum after the date of default until paid. The note further provided that if default was made and the note placed in the hands of an attorney for collection, the makers and endorsers agreed to pay a reasonable attorney's fee for such collection.
*850 19. Ramsey did not make the first two payments as scheduled, and then on June 1, 1979, Crow executed a so-called stockpower to Ramsey, whereby Crow purported to sell, assign, and transfer to Ramsey all of his rights, titles, and interest in any and all of Nike stock, and thereby irrevocably constitute and appoint Ramsey attorney to transfer the said shares on the books of Nike with full power of substitution in the premises. He further agreed to cooperate and execute all corporate resolutions that required his signature to reflect corporate action taken during the time he served as an officer of Nike. Ramsey signed the document as a witness.
20. On or about June 15, 1979, defendants paid $500.00 as the first installment on the promissory note, and thereafter made no further payments, claiming that Stan would not honor the power. The Crows demanded payment from defendants on October 11, 1979, and February 28, 1980.
21. Ramsey refused to pay and announced a rescission, claiming that Crow had defrauded him, that Crow violated the contract, a failure of consideration, and that Crow failed to deliver the shares of stock contracted for.
22. After the March 13 resolution, Ramsey spent time and money in an attempt to save Nike. An account was set up whereby Ramsey and Newspaper Dealer Supply could advance funds to Nike and Ramsey could draw checks on Nike.
23. In spite of Ramsey's efforts to turn Nike around, operations ceased in 1979 and the company was later dissolved in bankruptcy.
24. It was later discovered that the corporate charter of Nike was forfeited on January 1, 1979, when, through inadvertence, the corporate attorney or officers of Nike failed to file the appropriate franchise tax forms with the State of Missouri. When Nike was so informed by the Internal Revenue Service, the necessary steps were taken to restore the corporate charter, and on March 11, 1980, the Secretary of State of Missouri certified that the forfeiture was rescinded.

Conclusions of Law
1. This Court has jurisdiction over this cause pursuant to 28 U.S.C. § 1332(a)(1) as there exists complete diversity of citizenship between the parties and the amount in controversy exceeds the sum of $10,000.00 exclusive of interest and costs.
2. Where an obligee brings an action to recover on a promissory note and the note imports consideration, as in this case, and the defendants makers/obligors assert a failure or insufficiency of consideration, the burden is upon the defendants to come forward and establish their defenses "by a clear preponderance of credible evidence, and their proof must be cogent and convincing." Empire Gas Corp. v. Small's LP Gas Co., 637 S.W.2d 239, 246 (Mo.App.1982), citing Gover v. Empire Bank, 574 S.W.2d 464, 468 (Mo.App.1978).
3. The fact the physical stock certificates representing shares of stock in Nike were not issued to the plaintiffs when they paid for the shares is not dispositive of the plaintiffs' ownership of said shares.
It has long been held in Missouri that a share of stock is the actual property of the shareholder, an intangible property in the nature of a chose in action; the certificate of stock is a "muniment of title." Title to the shares may exist without the stock certificate, which is only evidence of the shareholder's property interest. Duncan v. Kelly, 435 S.W.2d 29, 33 (Mo.App.1968).
Kaiser v. Moulton, 631 S.W.2d 44, 48 (Mo. App.1981) (plaintiff recognized as shareholder in spite of ineffective delivery of stock certificate where corporate resolution and minutes signed by defendant showed plaintiff to be a shareholder). Plaintiffs paid $2,000.00 pursuant to a stock purchase agreement for six and one-quarter shares of stock, and there exists no conflicting claim of ownership of those shares. Accordingly, the Court finds plaintiffs held, at the least, an equitable ownership interest in those shares.
*851 4. Evidence at trial supported plaintiffs' claim that Nike was indebted to them for approximately $2,500.00 in business related expenses for which the company was bound to reimburse him pursuant to the employment contract. In Missouri, shares of stock may be issued by a corporation in return for the forgiveness of a debt. Mo.Rev.Stat. § 351.160; Mo. Const. Art. XI § 7 (statutory and constitutional prohibitions of watered stock requiring shares be paid for property or services and not a loan from the issuing corporation). In this case, although no certificates were issued, plaintiffs exchanged valuable consideration for the additional one and one-quarter shares of stock. Accordingly, the Court finds plaintiffs to be the equitable owners of those shares. Kaiser, supra. The Court therefore finds the plaintiffs to have been the equitable owners of a total of seven and one-half shares of Nike stock at the time of the board of directors meeting in March.
5. The Court finds no evidence of fraud in the circumstances surrounding the March, 1979, board meeting in Chicago where the meeting was solicited by the defendants for the purpose of accommodating his wish to become a one-half owner of Nike and he signed the resolution drafted as a result of the meeting.
6. The Nike corporate resolution dated March 13, 1979, shows that the number of shares owned by plaintiffs was reduced from a total of seven and one-half shares to six and three-quarters shares, that defendants were issued fifty shares. "In the absence of fraud in the transaction, the judgment of the board of directors as to the value of the consideration received for the shares will not be interfered with." Saigh v. Busch, 403 S.W.2d 559, 564-65 (Mo.1966). The Court finds, therefore, that as a result of this meeting and resolution, plaintiffs were the owners of six and three-quarters shares of Nike stock and defendants owned fifty shares.
7. Defendants have insisted that even if plaintiffs properly owned shares of Nike stock, they violated the contract for the sale of said stock by failing to deliver the securities or certificates of said stock to defendants as required by the Missouri Uniform Commercial Code (UCC) at Mo. Rev.Stat. § 400.8-309. The Investment Securities portion of the Missouri UCC cited by defendants governs the sale and negotiability of "securities" which are instruments or writings issued in bearer or registered form commonly recognized as a medium for investment which evidences a share, participation, or other in property or an enterprise, or evidences an obligation of the issuer. Mo.Rev.Stat. § 400.8-102. This section of the UCC governing the transfer of securities instruments, legal title of such instruments, and their negotiability, is not intended to "embrace the broad field of equitable rights and interests and their methods of transfer." Duncan v. Kelly, supra, 435 S.W.2d at 29 (distinguishing between the equitable ownership of a share of stock and the transfer of legal title without delivery of a certificate under the Uniform Stock Transfer Law, the predecessor to the Securities section of the UCC); see also Mo.Rev.Stat. § 400.8-101 Missouri Code Comment. Accordingly, defendants' reliance upon the Missouri UCC  Investment Securities, Mo.Rev.Stat. §§ 400.8-101 through 400.8-406, is misplaced as to matter of endorsement, delivery, breach of warranty and rescission.
8. Now that it is established that plaintiffs owned shares in Nike, the issue is whether that ownership interest was transferred to defendants in consideration for defendants' promissory note. The "stock power" or assignment executed by plaintiffs and witnessed by defendants, by its terms purports to make just such a transfer.
Missouri has the view of 6 A.C.J.S., Assignments, ¶ 49, p. 664, that "any language, however informal or poorly expressed, if it shows the intention of the owner of the property or chose in action to transfer it, clearly and unconditionally, and sufficiently identifies the subject matter will be sufficient to vest the property therein in the assignee." See Halvorson *852 v. Commerce Trust Co., 222 S.W. 897, 898(1) (Mo.App.1920).
Greater Kansas City Baptist and Community Hospital Association, Inc. v. Businessmen's Assurance Company, 585 S.W.2d 118, 119 (Mo.App.1979). Therefore, the Court finds that defendants received all of plaintiffs' interest in Nike in return for defendants' promissory note. Defendants' defense of insufficiency or lack of consideration must fail as value was recited and given.
9. Defendants suggest that plaintiffs' ability to sue on the note may be affected in some way by the fact that Nike's corporate charter was forfeited from January 1, 1979, until the Secretary of State rescinded the forfeiture on March 11, 1980. To the extent that the dealings of the parties in this case could have been limited by a forfeiture, Mo.Rev.Stat. § 351.540(2) provides that corporate acts during forfeiture are certified and validated upon rescission.
The effect of [§ 351.540(2)] for all practical purposes is to treat the forfeiture as if it had never occurred. In plain language the amendment provides for the restoration of all corporate rights and privileges to become effective from the very date of forfeiture and all acts taken between forfeiture and rescission are confirmed and held to be valid. Thus, even though it is unlawful for persons to exercise corporate powers after a charter has been forfeited, once that forfeiture has been rescinded the legislature has forgiven the illegal use of corporate powers.
A.R.D.C., Inc. v. State Farm Fire & Casualty Co., 619 S.W.2d 843, 846 (Mo.App. 1981) (footnote omitted). The forfeiture of Nike's charter in this case, therefore, has no bearing on the rights of the parties.
10. Defendants also challenge the validity of the March 12 meeting and resulting resolution. They claim that not all of the board of directors were present, some shareholders were not notified, that only the new directors signed the resolution, and the meeting itself was improperly held outside the State of Missouri. However, the meeting was not held outside of Missouri to inconvenience the defendants, defendants sought the meeting itself, the purpose of the meeting was to accommodate defendants' ownership goals, all other shareholders agreed to reduce their shares in reliance upon defendants' assurances that he would help Nike survive, defendants signed the resolution as a member of the board of directors, and none of the other shareholders or board members are heard to complain. Even if defendants have the standing to raise these issues on behalf of others, the Court finds the defendants estopped to complain of these actions taken by Nike at his urging and with his full cooperation where plaintiffs have relied on same and as a result ended up owning fewer shares of stock and the company is now out of business. See Central Microfilm Service Corp. v. Basic/Four Corp., 688 F.2d 1206, 1218 (8th Cir.1982), cert. denied, 459 U.S. 1204, 103 S.Ct. 1191, 75 L.Ed.2d 436 (1983) ("The Missouri cases consistently construe an estoppel claim to have three elements: (1) an act or statement inconsistent with the right later asserted; (2) reliance on such act or statement; and (3) injury.")
11. After careful consideration of the entire record, the Court concludes that plaintiffs did own shares of Nike stock and those shares were transferred to defendants as consideration for defendants' promissory note. For the reasons discussed above, judgment will be entered for plaintiffs and a reasonable attorney's fee, plus prejudgment interest at the rate of ten percent per annum from July 15, 1979, will be awarded to plaintiffs as agreed by the parties in the promissory note.

JUDGMENT
In accordance with the memorandum opinion of the Court filed this day, which is incorporated into and made a part of this judgment,
IT IS HEREBY ORDERED, ADJUDGED, AND DECREED that judgment be and the same is entered in favor of *853 plaintiffs, Michael and Barbara Crow, and against defendants, Newspaper Dealer Supply, Inc., and Dennis W. Ramsey, in the amount of $14,500.00, plus prejudgment interest thereon at the rate of ten percent per annum from July 15, 1979, a reasonable attorney's fee, and costs.
IT IS HEREBY FURTHER ORDERED, ADJUDGED, AND DECREED that, within ten days, defendants shall respond to plaintiffs' affidavit for attorney's fees, filed as plaintiffs' exhibit 9 at trial.