Edward J. ALEXANDER, Appellant,

v.

LINK'S LANDING, INC., Respondent.

No. 16914.

Missouri Court of Appeals,
Southern District,
Division One.

July 23, 1991.

Motion for Rehearing and/or Transfer to
Supreme Court Denied
Aug. 14, 1991.

Rexford H. Caruthers, Patricia N. McCloskey, Caruthers, Herzog, Crebs & McGhee, St. Louis, for appellant.

Charles E. McElyea, Philip J. Morgan, Phillips, McElyea, Walker & Carpenter P.C., Camdenton, for respondent.

PER CURIAM.

The claims in this judge-tried case were asserted in the first amended petition of plaintiff Edward J. Alexander against defendant Link's Landing, Inc., and the latter's first amended counterclaim against plaintiff.

Plaintiff's pleading contained three counts. Count I sought rescission of a

contract in which plaintiff agreed to buy a boat from defendant. The ground for rescission was an alleged misrepresentation. Count II sought rescission of the same contract because defendant failed to assign the manufacturer's statement of origin of the boat to plaintiff. Count III sought actual and punitive damages for defendant's alleged conversion of the boat some 17 months after plaintiff had taken possession of it under the purported contract.

Defendant's first amended counterclaim sought $3,734.10 (plus interest) from plaintiff for sundry goods and services allegedly supplied plaintiff by defendant.

The trial court received evidence, made comprehensive findings of fact and conclusions of law, and entered judgment awarding plaintiff $10 "nominal damages" and $500 punitive damages on Count III of his first amended petition. The judgment granted no relief on Counts I and II, ruling they were "in the alternative to Count III." The judgment awarded defendant $1,155.88 on its first amended counterclaim.

Plaintiff appeals, but assigns no error regarding the award on the counterclaim. Plaintiff complains the damages awarded him on his conversion claim were too low. He also avers the trial court erred by declining to hold defendant's failure to "fully complete the manufacturer's statement of origin on the boat voided the assignment of title" to him.[1]

At the conclusion of the evidence, the trial court invited the parties to submit proposed findings of fact and conclusions of law. Defendant submitted extensive findings of fact. Plaintiff agreed with most of them. Our account of the facts begins with those on which the parties agreed.

Defendant is a corporation engaged in the business of selling, servicing and storing boats. At all times pertinent herein, plaintiff had a Missouri license "to act as a dealer in the acquisition and sale of boats."

On or about May 22, 1987, plaintiff, as buyer, and defendant (acting by David Logsdon, its general manager), as seller, signed a "sales agreement" for a Trojan boat. In partial payment, plaintiff traded in a Century boat, leaving a balance of $46,067 due defendant. Plaintiff arranged for a loan from Bank of Lake of the Ozarks to pay this sum "or a portion thereof."

A manufacturer's statement of origin to the Trojan boat showed it was a new boat and its first transfer in ordinary trade and commerce was from the manufacturer to defendant. This document was delivered to the bank, but the assignment form on the reverse side was neither filled in nor signed. Simultaneously, the bank paid defendant the balance of the purchase price. The statement of origin was never delivered to the "license bureau" for registration of the Trojan boat in plaintiff's name.

The Trojan boat remained at defendant's marina. During the 1987 summer, plaintiff and his employees used the Trojan boat, and while doing so displayed plaintiff's "dealer number" on it.

In May, 1988, plaintiff's bank loan was "renewed." A bank official noticed the manufacturer's statement of origin had not been signed by a representative of defendant. The following month it was signed by Logsdon at the bank, but his signature was not notarized.

Plaintiff and his employees used the Trojan boat during the 1988 summer. It remained at defendant's marina. Plaintiff never paid any storage charges.

Plaintiff never attempted to sell the Trojan boat, but insisted defendant try to do so. Defendant began trying in the summer of 1987, and attempted to keep the boat clean to facilitate the sale.

---

**1.** Plaintiff's assertion that he never acquired ownership of the boat seems repugnant to a claim for conversion of it, as discussed *infra.* Plaintiff's brief is confusing in other respects. It begins by erroneously identifying Count I as the claim that defendant's failure to assign the manufacturer's statement of origin to plaintiff "voided the attempted transfer of title." It then erroneously identifies Count II as the conversion claim. It ignores the count seeking rescission for misrepresentation (Count I). Additionally, in flagrant disregard of Rule 84.04(h), Missouri Rules of Civil Procedure (1990), the statement of facts contains no page reference to the legal file or transcript.

As of September 1, 1988, plaintiff owed defendant $1,155.88 for sundry goods and services.

In October, 1988, defendant removed the Trojan boat from the water and placed it in storage. At that time, plaintiff still owed defendant $1,155.88 on account.

If someone had a delinquent account with defendant, it was defendant's normal practice to prevent the debtor from using his boat, and defendant would do no additional work on it unless the account was paid. One of the reasons defendant removed the Trojan boat from the water in October, 1988, was because plaintiff's account was delinquent. Additionally, defendant automatically "winterized" boats when it appeared necessary, even though customers did not authorize it.

The trial court found other facts besides those on which the parties agreed. Two pertinent to this appeal are set forth below. Both are supported by substantial evidence.

The fair market value of the Trojan boat on October 1, 1988, was $80,000.

Defendant's lawyer advised plaintiff's lawyer by letter of June 16, 1989, that plaintiff could take possession of the Trojan boat and use it.

In addition to those findings, we note plaintiff admitted at trial he knew about the letter of June 16, 1989, from defendant's lawyer regarding possession of the Trojan boat.

On plaintiff's conversion claim, the trial court ruled:

"... Defendant did convert the ... Trojan [boat] to its own use from October, 1988 to June, 1989. Defendant did not have a right to retain possession of the boat in question until its statement was paid.... However, Plaintiff has failed to show that he suffered any damages other than nominal.

... Defendant's conduct in refusing to allow Plaintiff to take possession of said boat during October of 1988 was willful, wanton or malicious and Plaintiff is entitled to punitive damages. However, punitive damages are tempered by the facts that Defendant was attempting to sell the boat for Plaintiff and restricted use of the boat to keep it clean and facilitate the sale. Further, one cannot use the boat in the winter months. Plaintiff was allowed use of the boat in June, 1989."

Plaintiff's first point relied on is:

"The trial court erred when it failed to award [plaintiff] damages for conversion measured by the reasonable market value of the converted property on the day of conversion plus interest therefrom."

■ Plaintiff points out the measure of damages in conversion suits is generally the reasonable market value of the property at the time of conversion. *Farmers & Merchants Bank of St. Clair v. Borg–Warner Acceptance Corp.*, 665 S.W.2d 636, 639[2] (Mo.App.1983); *Weldon v. Town Properties, Inc.*, 633 S.W.2d 196, 198[1] (Mo.App.1982); *Breece v. Jett,* 556 S.W.2d 696, 709 (Mo.App.1977).

Defendant responds by directing us to *Vetter v. Browne,* 231 Mo.App. 1147, 85 S.W.2d 197 (1935). There, the owner of an automobile claimed he parked it on a parking lot and surrendered possession to agents of the lot owner, and when he returned for the automobile several hours later the lot owner refused to surrender possession. The automobile owner recovered the automobile five months later. Regarding his measure of damages, the opinion explained:

"Where an automobile has been converted by another and the vehicle has thereafter been returned and accepted by the owner thereof, the measure of damages is the difference between the value of the car at the time of the conversion and the value of the car at the time of the return, plus the reasonable value for the loss of the use of such vehicle during the period of time that the owner has been deprived thereof. (Citations omitted.)" 85 S.W.2d at 199.

Plaintiff maintains that in order to mitigate damages, the tort-feasor must prove return of the property and its acceptance by the rightful owner. Plaintiff asserts he "never accepted return of the tendered [Trojan] Boat." Consequently, insists

plaintiff, defendant's attempt to tender return of the boat cannot be considered in mitigation of damages.

The positions of the parties throughout this saga have been prevaricative. In Count III of his first amended petition, plaintiff pled he is the owner of the Trojan boat. At trial, plaintiff disclosed he paid no sales tax on it. Asked why, he responded: "I'm a boat dealer.... And I didn't purchase the boat."

Later, plaintiff testified he acquired the Trojan boat for pleasure and business. He avowed he never tried to sell it, yet he stipulated that he insisted defendant try to sell it.

Elsewhere in his testimony, plaintiff said that on or about May 22, 1987 (the date on the "sales agreement"), Logsdon said he wanted the Trojan boat back in August, 1987, and "he would return the money that the bank has given him for that boat, for the use of that boat." Plaintiff quoted Logsdon as saying he did not sign the manufacturer's statement of origin because "he wanted to sell that boat as a new boat in August or any time prior to August."

If this means (a) Logsdon intended to return to plaintiff the money defendant received from the bank in payment of the balance due on the purchase price of the Trojan boat, and (b) defendant would sell the Trojan boat and keep the proceeds, plaintiff would end up with neither the Trojan boat nor the Century boat he traded in—a bizarre result that would leave plaintiff with a substantial loss.

If it means (a) Logsdon intended to return to the bank the money defendant received from it in payment of the balance due on the purchase price of the Trojan boat, and (b) defendant would sell the Trojan boat and keep the proceeds, plaintiff would still end up with neither the Trojan boat nor the Century boat, again sustaining a substantial loss (even assuming the bank applied the returned money against plaintiff's loan).

If it means (a) Logsdon intended to return to plaintiff the money defendant received from the bank in payment of the balance due on the purchase price of the Trojan boat, and (b) defendant would sell the Trojan boat for a commission and remit the balance of the proceeds to plaintiff, defendant would end up with only a sales commission and the Century boat, a substantial loss for defendant.

It requires scant intelligence to recognize none of these scenarios is plausible.

Logsdon's testimony was similarly arcane. He testified that when defendant undertakes to sell a customer's boat, defendant and the customer sign a "brokeraging" agreement. He recalled no such agreement with plaintiff regarding the Trojan boat and avowed defendant had none in its files. Despite that, Logsdon admitted, "I had tried to sell it myself a few times."

Later in his testimony, Logsdon was shown a document dated "4/25/87." He characterized it a "sales agreement" regarding the Trojan boat. He identified handwriting on the document as his. According to Logsdon, it read: "Boat will be put up for sale in August. Alexander will get to 68,000. No storage charges will be incurred."

■ In *Pantz v. Nelson*, 234 Mo.App. 1043, 135 S.W.2d 397 (1939), the court cited *Ward v. Moffett*, 38 Mo.App. 395 (1889), for the following propositions. In actions of trover, if the owner regains his property, the measure of damages is what he has lost by the temporary conversion, and no more. Evidence that the tort-feasor has relinquished all claim to the property, that he never removed it from the place where it originally was, and never in point of fact converted it to his own use, has been held admissible in mitigation of damages. If the tort-feasor came lawfully into possession of the goods and his refusal to surrender them was qualified, or if the conversion was technical only, or without willful wrong on his part, and the property remained entirely in status quo, the tort-feasor may compel the owner to accept it in mitigation of damages. *Pantz*, 135 S.W.2d at 403.

Given the abstruse tale presented by the record here, we believe the above principles are uniquely suited to this case.

■ In so deciding, we do not overlook the passage in *Pantz* indicating tender must be made before suit is filed. 135 S.W.2d at 403. Here, the letter from defendant's lawyer tendering plaintiff possession of the Trojan boat came after suit was filed. However, plaintiff's original petition—filed October 4, 1988—contained only one count; it sought rescission of the contract and judgment against defendant for $78,250, the alleged "contract purchase price" of the Trojan boat. That relief is consistent with defendant's retention of the Trojan boat. Plaintiff's conversion claim was first asserted in the first amended petition. It averred the conversion occurred on or about October 15, 1988. That date was eleven days *after* plaintiff's original petition was filed. It is thus evident suit was pending *before* the alleged conversion occurred. Obviously, there can be no tendered return of converted property until conversion occurs. On these facts, the rule that tender must come before suit is filed is patently inapplicable.

■ Our review of this court-tried case is governed by Rule 73.01(c), Missouri Rules of Civil Procedure (1991), as construed in *Murphy v. Carron*, 536 S.W.2d 30 (Mo. banc 1976). The judgment of the trial court will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. *Id.* at 32[1].

■ Here, plaintiff docked the Trojan boat at defendant's marina after the transaction of May 22, 1987. It remained there during the 1987 and 1988 summers, during which plaintiff and his employees used it whenever they chose, displaying plaintiff's "dealer number" on it. During the period

defendant withheld the Trojan boat from plaintiff, it remained on defendant's property. Defendant never claimed ownership, but insisted only that plaintiff pay his account. Logsdon testified the Trojan boat was "shrink wrapped" [2] after it was pulled from the water in October, 1988.

On such a record, we cannot convict the trial court of erroneously applying the law by failing to award plaintiff the reasonable market value of the Trojan boat as of the date of the alleged conversion. As indicated earlier, we believe the trial court was justified by *Pantz*, 135 S.W.2d 397, in holding plaintiff was entitled to only such damages as he sustained by reason of defendant withholding the Trojan boat from him during the period from on or about October 15, 1988, until June 16, 1989.

Plaintiff's first point is denied.

His second point:

"Even if it was proper for the trial court to compel plaintiff to accept tender of the Boat to mitigate damages, the trial court erred by failing to award damages in an amount equal to the diminution in value of the Boat during the period of conversion."

In his reply brief, plaintiff forthrightly concedes he presented no evidence of the fair market value of the Trojan boat at the time defendant tendered its return. However, explains plaintiff, he did not anticipate the trial court would refuse to award him the fair market value of the Trojan boat as of the date of the alleged conversion.[3]

■ Evidence must be adduced to fix the measure of damages. *Grimm v. Sinnett*, 567 S.W.2d 418, 421[10] (Mo.App. 1978). Damages can never be presumed. *Newton Burial Park v. Davis*, 78 S.W.2d 150, 153–54[3] (Mo.App.1934). Where the measure of damages is the decline in value of property between the date of its conver-

---

2. Logsdon explained "shrink wrapped" is a term "for winter storing of boats." He added: "It's a protective cover that we just literally heat on the boat, and it protects it from the rain, the snow. There is nothing that can get in the boat."

3. Plaintiff argues that if his first point is denied, he should receive a new trial for the purpose of establishing the fair market value of the Trojan boat at the time of its tendered return. Plaintiff cites no authority demonstrating he is entitled to such novel relief, and we are aware of none.

sion and the date of its return, there must be evidence of its value as of those dates. *Cf. Misch v. C. B. Contracting Co.*, 394 S.W.2d 98, 101[4] (Mo.App.1965).

■ As there was no evidence the Trojan boat declined in value during the time defendant withheld it from plaintiff, the trial court did not err by failing to award plaintiff damages for diminution in value. Plaintiff's second point is denied.

■ Before leaving it we note—and defendant concedes—that where a conversion is established, the owner of the converted property is entitled to at least nominal damages, and may recover punitive damages if the conversion is malicious. *Jackson v. Engert*, 453 S.W.2d 615, 617[2] (Mo.App. 1970). Defendant did not appeal and plaintiff does not complain the punitive damages awarded him were too low, hence those damages are not in dispute.

Plaintiff's third (and final) point is:

"The trial court erred by failing to rule that [defendant's] failure to fully complete the manufacturer's statement of origin on the [Trojan] boat voided the assignment of title to [plaintiff]."

In arguing this point, plaintiff proclaims the trial court should have held the attempted transfer of ownership of the Trojan boat was void ab initio for defendant's "failure to complete all necessary documents of title."

■ To maintain a suit for conversion, a plaintiff must have title to, or a property right in, and a right to immediate possession of, the property concerned at the time of conversion. *Osborn v. Chandeysson Electric Co.*, 248 S.W.2d 657, 663[8] (Mo. 1952); *Twellman v. Lindell Trust Co.*, 534 S.W.2d 83, 97[25] (Mo.App.1976).

Plaintiff neglects to explain what the effect would be on his conversion claim should we sustain his third point and hold he never became owner of the Trojan boat. While that is an intriguing subject, we need not probe it.

Defendant's failure to assign the manufacturer's statement of origin to plaintiff

was pled as the ground for rescission of the contract in Count II of plaintiff's first amended petition. As reported earlier, the trial court, upon awarding plaintiff nominal and punitive damages on his conversion claim (Count III), held Counts I and II were in the alternative to Count III.

The trial court was correct. Count II sought rescission of the contract and judgment against defendant for $78,317, the alleged "full amount" of the purchase price of the Trojan boat.[4] Awarding plaintiff this sum in addition to the nominal and punitive damages on Count III would result in his receiving a refund of the entire purchase price, plus free use of the new Trojan boat during the 1987 and 1988 summers, plus nominal and punitive damages for its alleged conversion—an obvious windfall.

■ Rescission of a contract extinguishes it as effectually as if it had never been made, and restores the parties to the positions they occupied before the contract was executed. *Henges Co., Inc. v. May*, 223 S.W.2d 110, 113[6] (Mo.App.1949). In other words, the parties are revested with their original rights regarding the subject matter, and they are no longer bound by the contract in regard to their subsequent actions. *Id.*

■ It is obvious a judgment rescinding the contract of sale of the Trojan boat and restoring plaintiff and defendant to the positions they occupied before executing it would mean plaintiff never became owner of such boat or entitled to its possession. Consequently, he would have no basis for his conversion claim. We hold plaintiff's claim for rescission and his conversion claim are inconsistent.

■ Where a party has a right to pursue one of two inconsistent remedies, makes his election, institutes suit and prosecutes it to final judgment, or receives something of value on the claim, he cannot thereafter pursue another and inconsistent remedy. *Pemberton v. Ladue Realty &*

---

**4.** Plaintiff's original petition, as we have seen, alleged the price was $78,250.

*Construction Co.,* 359 Mo. 907, 224 S.W.2d 383, 385[5] (1949).

Here, plaintiff prosecuted his conversion claim to final judgment and received an award of $10 nominal and $500 punitive damages. The punitive damages were never in dispute in this appeal, and thus will be affirmed. We have rejected plaintiff's complaints that he should have been granted more actual damages than the $10 nominal damages the trial court awarded. That being so, plaintiff is assured a money judgment on Count III of his first amended petition totaling $510. Having won that relief, we hold plaintiff cannot seek reversal of that portion of the judgment denying the rescission claim and pursue it anew on remand. Consequently, we need not, and do not, decide whether the trial court erred in failing to hold plaintiff never became owner of the Trojan boat. Plaintiff's third point is moot.

Judgment affirmed.