950 F.Supp. 1454 (1996)
CHICAGO TRUCK DRIVERS, HELPERS AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, et al., Plaintiffs,
v.
BROTHERHOOD LABOR LEASING, MFI Leasing Company, Falls City Industries, Inc., Middlewest Freightways, Inc., Defendants and Counterclaim Plaintiffs,
v.
CHICAGO TRUCK DRIVERS, HELPERS, AND WAREHOUSE WORKERS UNION (INDEPENDENT) PENSION FUND, et al., Counterclaim Defendants.
No. 4:93 CV 2376 DDN.
United States District Court, E.D. Missouri, Eastern Division.
December 4, 1996.
*1455 *1456 *1457 Nelson L. Mitten, Riezman and Blitz, St. Louis, MO, David S. Allen, Joseph M. Burns, Jacobs and Burns, Chicago, IL, for Chicago Truck Drivers, Helpers & Warehouse Workers Union Pension Fund, George Ossey, Tony Cullotta, John Broderick and William H. Carpenter.
Terrance J. Good, Vice-President, Lashly and Baer, St. Louis, MO, Matthew B. Moore, Howard D. Lay, Brian H. Schmidt, Dysart and Taylor, Kansas City, MO, Leonard R. Kofkin, Chicago, IL, Steven J. Teplinsky, Donald J. Vogel, Mary Elizabeth Gardner, Fagel and Haber, Chicago, IL, for Brotherhood Labor Leasing, MFI Leasing Company, Falls City Industries, Inc. and Middlewest Freightways, Inc.

MEMORANDUM
NOCE, United States Magistrate Judge.
This action is before the court upon the motions (1) of the plaintiffs to compel discovery from witnesses Taylor and Helt; (2) of the plaintiffs to correct a deposition transcript; (3) of the plaintiffs to dismiss defendants' state law counterclaims; (4) of the plaintiffs to dismiss defendants' RICO counterclaim; (5) of the defendants to amend their counterclaims; (6) of the defendants for summary judgment; and (7) of the plaintiffs for summary judgment. The parties have consented to the exercise of authority by a United States Magistrate Judge under 28 U.S.C. § 636(c)(3).
Plaintiffs are the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Independent) Pension Fund and its Trustees (Pension Fund or Fund). They have brought this action against defendants Brotherhood Labor Leasing (Brotherhood); MFI Leasing Company (MFI); Falls City Industries, Inc. (Falls City); and Middlewest Freightways, Inc. (Middlewest), for the collection of withdrawal liability under the Employee Retirement Income Security Act of 1974 (ERISA), as amended by the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 et seq. In the original complaint, which was filed in the United States District Court for the Northern District of Illinois, plaintiffs sought $962,523.00, payable in 24 quarterly installments, plus liquidated damages, attorneys fees and costs.
In their second amended complaint, filed in this court, plaintiffs allege that on December 21, 1992, Be-Mac Transport Company, Inc. (Be-Mac), which had been in the business of motor transportation, ceased its operations. Be-Mac had previously entered a collective bargaining agreement with the Chicago Truck Drivers, Helpers and Warehouse Workers Union (Union). This collective bargaining agreement was to be in effect from April 1, 1991, to March 31, 1994. Under the terms of the collective bargaining agreement and a related Trust Agreement, Be-Mac was to make contributions to the Pension Fund.
The amended complaint alleges that on February 11, 1993, and October 14, 1995, respectively, the shareholders of Be-Mac received from plaintiffs the original notice and the revised notice and demand for the payment of withdrawal liability, ultimately reduced to $455,719.00, for completely withdrawing from participation in the Pension Fund. Plaintiffs seek the recovery of withdrawal liability of $455,719.00, payable in 36 quarterly installments, damages resulting from the failure to make the installment payments, plus liquidated damages, attorneys' fees, and costs.
Plaintiffs allege that on December 21, 1992, when Be-Mac ceased operations and thus withdrew from the Pension Fund, controlling amounts of voting stock of Be-Mac were owned by William H. Behrens, Steven M. Gula, and Robert L. Ferguson; that on December 21, 1992, Mssrs. Behrens, Gula, and Ferguson also owned the stock of defendants Brotherhood and MFI; that defendant Falls City was wholly owned by MFI; and that defendant Middlewest was wholly owned by Falls City. Plaintiffs allege that Be-Mac, Brotherhood, MFI, Falls City, and Middlewest, therefore, are liable for Be-Mac's withdrawal *1458 liability because they comprise a "single employer" entity responsible for the withdrawal, as prescribed by 29 U.S.C. § 1301(b)(1).
Defendants allege and argue that the stock of Be-Mac was never owned by Behrens, Gula, and Ferguson; or, if ever owned, the transfer of ownership was rescinded by a judgment of the United States District Court for the Western District of Missouri; and that the defendants are not liable as participants in a controlled group with Be-Mac.

1. Defendants' Proposed Counterclaims.
In response to plaintiffs' second amended complaint, defendants filed four counterclaims, three under state law and one under the Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. §§ 1961-1968. In response to plaintiffs' motions to dismiss, defendants have abjured their original counterclaims and have moved for leave to file proposed amended counterclaims. In this procedural context, the court will grant the plaintiffs' motions to dismiss the defendants' original counterclaims and will consider the relevant arguments, pro and con, concerning whether the proposed amended counterclaims should be allowed to be filed.
In general, defendants' proposed[1] counterclaims are founded upon proposed allegations which describe a history of improprieties in the operation of the Union, the plaintiff Pension Fund, and the Production and Maintenance Local Union 101 (Local 101), which the individual fund trustee plaintiffs control. In addition, defendants would add as parties (counterclaim defendants) John Johnson and Paul Glover, former trustees of the plaintiff Fund.
Defendants would allege that the unions and the Fund are separate entities and are enterprises which affect interstate and foreign commerce. Defendants would allege further that:
(a) The plaintiff Trustees had allowed Glover, Johnson, the Union, and Local 101 to conspire and dissipate the monies of the plaintiff Fund, in violation of 18 U.S.C. §§ 1954, 1964(c), and 1962.
(b) Plaintiffs engaged in "bad investments, sweetheart deals, personal kickbacks, overspending, excessive directors fees and expenses, excessive attorney fees and general squandering of already inadequate funds with no exercise of audits, bonding requirements or supervision to monitor the resources and expenses of the Fund causing great damage to the taxpaying public, beneficiaries, contributors, potential contributors, and control group parties who, by contracts with the Union, are required to contribute to the Fund and who have no protection or input except to rely upon the two Union and two Management designated Trustees."
See Proposed Counterclaims, ¶¶ 2 and 3, filed January 19, 1996.
Defendants further allege that in 1988 U.S. Truck Lines, Inc. of Delaware (UST), the parent of Be-Mac and Motor Express, Inc. of Indiana (MXI), attempted to "absorb" MXI into Be-Mac to evade the application of a collective bargaining agreement to which Be-Mac was a party and to create the illusion that employees of Be-Mac were employees of MXI for the purposes of Fund contributions and the check-off of union dues. In spite of this arrangement, which defendants allege was unlawful, plaintiffs have in this judicial action pursued defendants for the withdrawal liability of MXI, which is the subject of arbitration proceedings in the Northern District of Illinois. Defendants allege that all of this was known to the individual plaintiffs.
Defendants further allege that in 1992 Glover and Johnson were defeated for re-election to official positions in the Union, in part because they had unlawfully approved union salaries for themselves. In 1992, one Sue Bennett, a stock broker handling Fund investments, sued Johnson and Glover for extorting money from her, and in 1992 she pled guilty to paying kickbacks to Johnson and Glover from Fund investment commissions she earned. In 1995, Glover and Johnson were convicted of a "labor racketeering" conspiracy *1459 and income tax evasion relating to the Fund investments, which defendants would allege
was all in violation of federal law generally known as ERISA, and the LMRA 29 U.S.C. 401 et seq. and 501 and 502 and laws of Illinois and the failure to report income as a violation of federal and state tax laws.
See Proposed Counterclaims, ¶ 4, filed January 19, 1996.
Defendant would allege that the identified current and former Fund trustees
have been grossly negligent and have knowingly and in bad faith breached their fiduciary duties by ignoring, approving, ratifying, and failing to stop, inquire or investigate and, probably in some instances, participating in wrongful and illegal labor racketeering patterns or schemes (including the 18 counts where Glover was convicted and counts where Johnson pleaded guilty) to deplete the Fund and incur excessive expenses, knowing the ultimate source of replacement funding was to assess excessive and prohibitive withdrawal liability, raise assessments and, if all else failed, to let PGBF [(the Pension Guaranty Benefit Fund)] (which is the taxpaying public) pay the shortages under ERISA.
Id. at ¶ 6. Defendants would further allege that the lack of knowledge about the specific facts of this judicial action by the Fund trustees (demonstrated in their depositions), the October 1995 reduction of the claim to $455,719 by plaintiffs, and the failure of the plaintiffs to formally acknowledge that defendants have placed $300,000 in escrow in this action, demonstrates that there was insufficient investigation of the claims before they were filed and that this failing was with "a total outrageous, evil motive and intent to cause damages to these defendants and all beneficiaries and contributors to the Fund." Id. at ¶ 7. Defendants would further allege that the Fund continues to be badly managed and underfunded.
For the reasons set out below, the court has determined that defendants' proposed counterclaims are legally insufficient. Therefore, leave to file the proposed amended counterclaims would be futile and may be denied for this reason. Williams v. Little Rock Mun. Water Works, 21 F.3d 218, 225 (8th Cir.1994).

a. Defendants' state law counterclaims.
Defendants' proposed Count I counterclaim alleges that the plaintiffs were grossly careless and negligent in claiming in the original complaint filed in this action and in proceedings against Be-Mac in proceedings in the Bankruptcy Court of this district the original amount of alleged withdrawal liability, in violation of 18 U.S.C. §§ 152 and 3571. Defendants would allege that the
negligence continued by interstate transportation, use of U.S. Mail and interstate phone lines for 2 to 2½ years while plaintiffs incurred and caused defendants to incur enormous fees and expenses that were not justified in order for plaintiffs to pursue and defendants to defend a claim stated for three times the arguably correct maximum. On January 16, 1996 the Fund has finally attempted to purge itself and avoid prosecution by amending the Fund's Bankruptcy Claim against Be-Mac.
Id. at ¶ 12. Defendants would allege that 29 U.S.C. § 1399 requires
a sponsor and the Trustees to make a good faith effort [to] properly manage Fund assets and to determine the correct amount before issuing notice and payment demand, and plaintiffs had a duty to defendants to do so where plaintiffs intended to assert a common control liability claim against defendants.
Id. at ¶ 14. Defendants seek compensatory and punitive damages.
Counterclaim Count II would allege that the plaintiff trustees breached their fiduciary duties regarding the facts alleged in the proposed Count I counterclaim, citing McKeehan v. Wittels, 508 S.W.2d 277 (Mo.Ct. App.1974). Proposed Count III invokes the theory of prima facie tort[2] and alleges that *1460 plaintiffs, with respect to the Count I and Count II counterclaims, acted without justification, assuming this court ultimately does not find that defendants are liable to plaintiffs.
Plaintiffs have moved to dismiss the state law counterclaims. Plaintiffs argue they are preempted by ERISA because they are related to the operation of the Fund and the relationships between the Fund and the defendants as the asserted employer. In enacting ERISA, Congress provided that the Act "shall supersede any and all State laws insofar as they may now or hereafter relate to any [non-exempt] employee benefit plan described in section 1003(a) of this title...." 29 U.S.C. § 1144(a). This preemption applies to common law judicial actions as well as to state legislation. Pilot Life Ins. Co v. Dedeaux, 481 U.S. 41, 47, 107 S.Ct. 1549, 1552-53, 95 L.Ed.2d 39 (1987); Capital Mercury Shirt Corp. v. Employers Reinsur. Corp., 749 F.Supp. 926, 931 (W.D.Ark.1990). There can be no doubt but that, in response to the allegations of the second amended complaint, defendants' proposed Counts I-III counterclaims invoke state law and "relate to" the fiscal viability of the plaintiff Pension Fund, which defendants are deemed to have admitted is an employee benefit plan under ERISA. See Defendants' Answer to Second Amended Complaint, ¶ 2, filed November 28, 1995; Federal Rule of Civil Procedure 8(d). See also Minnesota Chapter of Assoc'd Builders and Contractors, Inc. v. Minnesota Dep't of Labor and Industry, 47 F.3d 975, 978 (8th Cir.1995) (relevant to determining whether state law relates to an ERISA plan is whether the law affects the economics of the plan.) Defendants' counterclaims clearly seek relief for the activity of the plaintiffs in inflating the originally alleged withdrawal liability.
Defendants argue that their counterclaims are not preempted by ERISA, because the court might determine that defendants are not employers subject to the withdrawal liability in the first place. However, defendants' counterclaims are not based upon their asserted non-employer status, but upon the manner in which the withdrawal liability was determined. Nevertheless, claims in judicial actions, based upon state law, that are brought by or against third parties over the execution of plan trustees' duties also "relate to" the operation of the plan and are therefor preempted by ERISA. Cf. Consolidated Beef Ind., Inc. v. New York Life Ins. Co., 949 F.2d 960, 964 (8th Cir.1991), cert. denied, 503 U.S. 985, 112 S.Ct. 1670, 118 L.Ed.2d 390 (1992) (claim against third party seller of plan financial program preempted by ERISA); First Nat. Life Ins. Co. v. Sunshine-Jr. Food Stores, Inc., 960 F.2d 1546, 1550 (11th Cir.1992), cert. denied, 506 U.S. 1079, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993).
Defendants next argue that their state law counterclaims are not preempted, because Congress has not otherwise provided them a remedy for the alleged wrongs. This argument is without merit. The existence of a remedy in federal law is irrelevant to whether the state law claims are preempted. Consolidated Beef Ind., Inc. v. New York Life Ins. Co., 949 F.2d at 964. See also Thomason v. Aetna Life Ins. Co., 9 F.3d 645, 647 (7th Cir.1993); Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1276 (6th Cir.1991), cert. denied, 505 U.S. 1233, 113 S.Ct. 2, 120 L.Ed.2d 931 (1992).
Defendants argue that, if their state law counterclaims are preempted by ERISA, they can nevertheless be brought under federal common law. In this respect, defendants invoke 29 U.S.C. § 1451(a)(1), which provides: "A plan fiduciary, employer, plan participant, or beneficiary, who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan ... may bring an action for appropriate legal or equitable relief, or both."
Section 1451 can apply to the actions of the plaintiffs in determining the asserted withdrawal *1461 liability. Cf. Whitworth Bros. Storage Co. v. Central States, Southeast and Southwest Areas Pension Fund, 794 F.2d 221, 228 n. 9 (6th Cir.), cert. denied, 479 U.S. 1007, 107 S.Ct. 645, 93 L.Ed.2d 701 (1986). However, the thrust of defendants' proposed counterclaims is that the plaintiffs wrongfully determined the original amount of their withdrawal liability. This is just the type of dispute which Congress has required be submitted to arbitration. See 29 U.S.C. § 1401(a)(1).[3]
Furthermore, defendants cannot invoke § 1451 as they do because they do not allege, nor do their proposed allegations indicate, that defendants are plan fiduciaries or other persons entitled to sue under § 1451. Mere potential status as an employer is an insufficient basis for standing to sue. Eureka Paper Box Co. v. WBMA, Inc., Voluntary Employee Benefit Trust, 767 F.Supp. 642, 649-50 (M.D.Pa.1991).
Defendants refer the court to Carl Colteryahn Dairy, Inc. v. Western Penn. Teamsters and Employers Pension Fund, 847 F.2d 113 (3rd Cir.1988), cert. denied, 488 U.S. 1041, 109 S.Ct. 865, 102 L.Ed.2d 989 (1989). However, in that case, the court of appeals affirmed the authority of the federal courts to provide a remedy to an employer fraudulently induced to approve the merger of two funds. The allegations in the case did not involve the propriety of the withdrawal of the employer from the fund. Id. at 117, 121-22. In the case at bar, the wrong for which defendants seek a remedy, that is, the wrongful assessment of withdrawal liability, has a forum for the remedy in the mandatory arbitration of disputes involving the establishment, calculation, and amount of withdrawal liability. See 29 U.S.C. § 1401(a)(1); Trustees of Colorado Pipe Industry Pension Trust v. Howard Electrical & Mechanical, Inc., 909 F.2d 1379, 1385-86 (10th Cir.1990), cert. denied, 498 U.S. 1085, 111 S.Ct. 958, 112 L.Ed.2d 1046 (1991); In re Centric Corp., 901 F.2d 1514, 1518 (10th Cir.), cert. denied, 498 U.S. 852, 111 S.Ct. 145, 112 L.Ed.2d 112 (1990).
For these reasons, the motion of plaintiffs to dismiss the defendants' state law counterclaims must be granted. Defendants' motion for leave to file their proposed amended counterclaims must be denied.

2. Defendants' RICO counterclaim.
Defendants filed an original Count IV counterclaim, alleging that plaintiffs are liable under RICO, 18 U.S.C. § 1962(c), for filing incorrect (inflated) claims of MPPAA withdrawal liability in the Bankruptcy Court of this district against Be-Mac and in this judicial action.
In the proposed amended Count IV counterclaim, defendants would incorporate the other proposed counterclaims and further allege that the plaintiffs
[are] Trustees and fiduciaries associated and controlling an enterprise (the Fund, the Union and [Local] 101) engaged in, or the activities which affect interstate and foreign commerce, to conduct or participate directly or indirectly in the conduct of [the] enterprise's affairs through a pattern of racketeering activity in violation of Section 1962(c) of Title 18 U.S.C. (the "RICO" Act).
See Proposed Amended Counterclaims, Count IV, ¶ 18, filed January 19, 1996. Defendants further allege that plaintiffs used interstate mails and telephones to file an incorrect bankruptcy claim, and that they regularly traveled to Missouri, Nevada, Michigan, and Kansas "in pursuit of racketeering activity." Id. at ¶ 19. Defendants further allege:
20. The use of the inflated bankruptcy claims by plaintiffs in the Be-Mac bankruptcy in St. Louis and demand for triple the amount of interim payments was a scheme or artifice to defraud, or for obtaining money by means of false and fraudulent pretenses and representation, in violation of ERISA and LMRA [(Labor Management Relations Act)]. After 2½ *1462 years of expensive litigation the Fund continues to argue, after a final rescission judgment on sale of Be-Mac stock, that this Court never had any jurisdiction on the merits of the claim, that defendants were shareholders of Be-Mac under a doctrine of common control.
21. The actions overstating the claim and repeatedly pleading allegations of crimes and frauds by defendants and their representatives, who were justified in asserting all possible defenses, was part of a scheme and artifice used by plaintiffs in other cases knowingly and intentionally to deceive, and with the fraudulent intent to make litigation and arbitration costs prohibitive to cause financial loss, force settlement payments, and reap financial gain for plaintiffs and the Fund and Union. The overstatement of the claim was false and fraudulent and related to a material fact with such reckless indifference, or even known to be untrue, that it was very material and important for a reasonable defendant to justify expenditure of the costs of defense. Therefore, such actions were the proximate cause of injury to defendants' business and property. Plaintiffs have a history and continuing similar pattern of harassing litigation that depletes fund assets and harasses contributors and third parties.
22. The separate entities consisting of the Union and the Fund lost the funds alleged by the four Trustees named plaintiffs herein have in addition to ratifying the conduct of Glover and Johnson failed and continue to fail to make the recoveries and claims for losses by the continual criminal activity of Johnson and Glover who were co-fiduciaries with plaintiffs all of whom failed in their fiduciary duties. The bad investments, kickbacks, failure to make bonding or other claims for losses under LMRA or other available means has depleted the Fund which increases the withdrawal liability calculation thereby damaging defendants if they are ever held responsible. The plaintiffs were associated with the Union and Fund at all relevant times where the enterprise acted as aforesaid and directly or indirectly conducted or ratified the affairs of the enterprise in multiple labor racketeering acts, where Glover was found guilty and Johnson pleaded guilty, together with other as yet undisclosed or non-indicted offenses that have impaired the assets of the Fund where plaintiffs now want defendants to contribute withdrawal liability to replenish the losses plaintiffs allowed to occur and failed to pursue and continue to fail to pursue.
23. The actual damages continue but will be the reasonable fees and expenses incurred in two and one-half years to force plaintiffs to reduce the demand to the correct figure (if there ever is a correct figure owed, which defendants deny) or the total of all fees, costs and expenses incurred, plus statutory penalty damages and fees provided by law. In addition, if under all claims herein defendants are ever found obligated to pay them, in such event the amounts allegedly due are greater damage to defendants because of loss of Fund assets by plaintiffs' failures as alleged herein.
Id.
RICO provides for a treble damages remedy to "[a]ny person injured in his business or property by reason of a violation of § 1962 of this chapter...." See 18 U.S.C. § 1964(c). Section 1962 prescribes specific criminal offenses upon which civil liability can be based, including:
It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.
18 U.S.C. § 1962(c).
A claimant seeking relief for a violation of § 1962(c) must allege that the claim defendant acted in the "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity." See Sedima, S.P.R.L. v. Imrex Co., Inc., 473 U.S. 479, 496, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985).
Plaintiffs argue that the proposed Count IV counterclaim is legally insufficient, because it fails to allege the existence of an *1463 enterprise that is distinct from each proposed counterclaim defendant. Under RICO,
"[E]nterprise" includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.
See 18 U.S.C. § 1961(4). Each party charged with liability under RICO must have participated in the operation or management of the RICO criminal enterprise. Reves v. Ernst & Young, 507 U.S. 170, 179, 113 S.Ct. 1163, 1170, 122 L.Ed.2d 525 (1993). Therefore, a claim defendant must be shown to be an entity separate from the enterprise itself. Atlas Pile Driving Co. v. DiCon Financial Co., 886 F.2d 986, 995 (8th Cir.1989). In the current proposed Count IV counterclaim, defendants would allege that the criminal enterprise is the composite of the plaintiff Fund, the Union, and Local 101, which is an entity separate from each of the individual proposed counterclaim defendants. Id.
Plaintiffs next argue that the proposed counterclaim fails to allege predicate acts of, and a pattern of, racketeering activity. Congress defined "racketeering activity" by a lengthy list of specific criminal activity, including mail fraud, indictable under 18 U.S.C. § 1341, and wire fraud, indictable under § 1343. See 18 U.S.C. § 1961(1). A liberal reading of the proposed amended counterclaim indicates that defendants would allege plaintiffs violated the following federal criminal statutes set out in 18 U.S.C. § 1961(1): 18 U.S.C. § 1954 (regarding kickbacks to a person involved with an employee benefit plan), § 1341 (mail fraud), and § 1343 (wire fraud); and 29 U.S.C. § 501(c) (regarding the conversion of the funds of a labor organization). Congress also requires that the RICO claimant allege and prove at least two acts of racketeering activity within the required time period. 18 U.S.C. § 1961(5). In determining the legal sufficiency of the proposed allegations, the court must strictly construe the pleading for the presence of the essential elements of the offenses described. Flowers v. Continental Grain Co., 775 F.2d 1051, 1053 (8th Cir.1985).
Any predicate criminal act which involves fraudulent conduct, as defendants' proposed allegations do, must be alleged with particularity. See Fed.R.Civ.P. 9(b); Murr Plumbing, Inc. v. Scherer Bros. Fin. Srvs. Co., 48 F.3d 1066, 1069 (8th Cir.1995). With respect to the proposed allegations of mail fraud and wire fraud, defendants must allege the time, place, and nature of the fraudulent activities, including the essential elements of the offenses cited in the proposed pleading. 48 F.3d at 1069. The court believes that defendants have not clearly alleged the essential elements of the predicate crimes they charge against the plaintiffs. Defendants' conclusory allegations of the interstate use of the mails and telephones and of physical travel to various states are insufficient to state a claim under RICO.
Plaintiffs also argue that the counterclaim fails to allege that any alleged predicate acts of racketeering activity caused defendants' injury. Defendants are required to plead and prove that plaintiffs' unlawful acts were the proximate cause of the defendants' injury. See Holmes v. Securities Investor Protection Corp., 503 U.S. 258, 267-68, 112 S.Ct. 1311, 1317-18, 117 L.Ed.2d 532 (1992). The proposed counterclaim alleges as defendants'[4] damages the reasonable fees and expenses it incurred over the course of this litigation to force plaintiffs to reduce their demand from an inflated figure. The proximate cause of such injury, of course, can be attributed only to the filing of the original complaint in this action and the subsequent reduction of the claimed damages. The proposed allegations of the history of asserted unlawfulness by the proposed counterclaim defendants is, as a matter of law, as demonstrated by defendants' allegations, entirely too remote to have proximately caused defendants' asserted injuries. In this respect, defendants' proposed RICO counterclaim is legally insufficient.
Defendants also appear to claim the statutory penalty damages and fees provided by *1464 law, which they would have to pay in this litigation. Of course, if such is required of defendants in the disposition of this action, then it cannot be gainsaid that the defendants themselves caused this result.
For these reasons, plaintiffs' motion to dismiss the defendants' RICO counterclaim must be sustained and the motion of the defendants for leave to file the amended counterclaim must be denied.

3. Motions for summary judgment.
The parties seek summary judgment under Rule 56, Federal Rules of Civil Procedure. This court must grant summary judgment if the pleadings and evidentiary showing demonstrate that no genuine issue of material fact exists and a moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986); Board of Educ., Island Trees Union Free School Dist. No. 26 v. Pico, 457 U.S. 853, 863, 102 S.Ct. 2799, 2806, 73 L.Ed.2d 435 (1982). Movants must initially demonstrate the absence of a factual issue for trial. Celotex, 477 U.S. at 323, 106 S.Ct. at 2552-53. Any doubt as to the existence of a material fact must be resolved in favor of the parties opposing the motion. Pico, 457 U.S. at 863, 102 S.Ct. at 2806.
Once a motion is properly made and supported, the opponents may not rest upon the allegations in their pleadings but must instead show evidence of specific facts sufficient to raise a genuine issue of material fact for trial. Fed.R.Civ.P. 56(e); Buford v. Tremayne, 747 F.2d 445, 447 (8th Cir.1984). Summary judgment must be granted to the movants if, after adequate time for discovery, the non-moving parties fail to produce any showing of evidence legally sufficient to establish an element essential to their case and upon which they will bear the burden of proof at trial. Celotex Corp., 477 U.S. at 322-24, 106 S.Ct. at 2552-53.
Summary judgment is not designed to dispose of "dubious" claims or to be a substitute for the trial of disputed fact issues. Its purpose is to settle those claims which have no basis in material fact. Wilson v. Myers, 823 F.2d 253, 256 (8th Cir.1987). This court would be in error, in deciding the motions for summary judgment, to weigh conflicting evidence and resolve an issue on that basis. Id.

Undisputed Facts.
The evidentiary record proffered by the parties indicates that the relevant dispositive facts are undisputed. Be-Mac Transport Company, Inc. (Be-Mac), is a Missouri corporation. Its transport business was originally incorporated in 1932. By 1975, its voting shares of stock numbered 200,000. By 1988, Be-Mac's authorized capitalization included 300,000 shares of voting stock. In 1988, it merged with Motor Express, Inc., of Indiana.
Before June 1989, U.S. Truck Lines, Inc., of Delaware (UST) owned 199,682 shares of Be-Mac stock. This stock was pledged to Metro North State Bank (Metro North) of Kansas City, Missouri, to secure loans by Metro North to UST and its parent corporation, ADM Acquisition Corp. Pl.Exh. 10 at 20; Pl.Exh. 11; Pl.Exh. 12 at 15; Def.Exh. 8; Def.Exh. 11; Def.Exh. 15.
On June 16, 1989, UST entered into a Stock Purchase Agreement with Be-Mac Acquisition ("Acquisition") (which was 100% owned by Behrens, Gula, and Ferguson) to sell 199,682 shares of Be-Mac common stock to Acquisition. UST agreed to transfer the stock to Acquisition at closing. UST financed this sale by accepting a $5,000,000 promissory note from Acquisition and a pledge of all the Acquisition stock owned by Behrens, Gula, and Ferguson. Pl.Exh. 13, attachments 2, 4-7.
On June 16, 1989, a written agreement (by UST, Acquisition, Be-Mac, and Metro North) was entered whereby, among other provisions, Metro North extended $4,990,287.56 in credit to Be-Mac for loans previously made to UST and others; UST assigned to Metro North a promissory note and pledges of Acquisition; Metro North released the Be-Mac stock previously pledged to secure the earlier UST loans; and Be-Mac simultaneously repledged the Be-Mac stock to Metro North as security for the repayment of the promissory note of Acquisition. Pl.Exh. 13, pp. XXXXXXX-XX. Also on June 16, 1989, Acquisition, Be-Mac, *1465 and Metro North executed a "Cross-Default and Cross-Collateralization Agreement" in which Metro North agreed to release UST's Be-Mac stock, and Acquisition agreed to simultaneously repledge its Be-Mac stock to Metro North. Pl.Exh. 13, pp. XXXXXX-XX. By letters dated June 16, 1989, Metro North agreed to the transfer of stock from UST to Acquisition. Pl.Exh. 13, pp. XXXXXX-XX.
At the June 16, 1989, transaction closing, the Be-Mac stock which had been issued to UST was not produced by Metro North for transfer to Acquisition. Rather, Metro North issued to Acquisition a single certificate which represented the 199,682 shares of stock previously owned by UST.[5] Metro North advised the parties that it intended to maintain possession of the stock certificates which had been issued to UST to avoid difficulties with the Bankruptcy Code. Def.Exh. 10 at 17-18. The original stock certificates were not transferred to Messrs. Gula, Ferguson, or Behrens, or to Be-Mac. Def.Exh. 11.
After June 16, 1989, Messrs. Behrens, Gula, and Ferguson operated Be-Mac as its shareholders. Pl.Exh. 34. Behrens, Gula, and Ferguson held (and voted at) shareholder meetings, Pl.Exh. 35, and elected themselves directors and officers of the company. Pl.Exh. 36; Pl.Exh. 37 at 98-105.
On March 6, 1990, Congress Financial Corporation agreed to lend credit to Be-Mac for the purchase of trucking equipment. Pl.Exh. 16 at 20, 23. In two letters dated February 9 and 25, 1990, legal counsel for Be-Mac informed Congress Financial's attorneys that Messrs. Gula, Ferguson, and Behrens acquired Be-Mac in June 1989 and that Be-Mac Acquisition was Be-Mac's majority shareholder. Pl.Exhs. 17 and 18. Congress Financial insisted that Be-Mac merge with Acquisition, its majority shareholder. Pl. Exh. 16 at 30, 32-38, 58-61; Pl.Exh. 19; Pl.Exh. 20; Pl.Exh. 21 at 6 ¶ h.[6]
Effective March 6, 1990, a Plan of Reorganization and Agreement of Merger (Plan) document was signed by Gula as secretary of both Be-Mac Acquisition Company, Inc., and Be-Mac Transport Company, Inc.; Ferguson signed as president of both corporations. The Plan recited that Ferguson, Gula, and Behrens shall each receive 66,560.66 shares of common stock of Be-Mac, effectively totalling the 199,682 shares of Be-Mac purchased by Acquisition.
On March 28, 1990, Taylor and Gula filed an application with the Missouri Division of Transportation for Be-Mac to assume Acquisition's June 16, 1989, promissory note. Pl. Exh. 23 at 2. A related document described Acquisition as Be-Mac's parent corporation. Pl.Exh. 24. On April 30, 1990, the Missouri Secretary of State issued a Certificate of Merger for Be-Mac. Pl.Exh. 25. The accompanying merger agreement recited that Behrens, Gula, and Ferguson owned Acquisition; that Acquisition owned Be-Mac; that Behrens, Gula, and Ferguson would each receive 66,560.66 shares of Be-Mac stock; and that no additional Be-Mac stock would be issued as a result of the merger. These certificates of Be-Mac Stock were issued to Behrens, Gula, and Ferguson on June 1, 1990, Pl.Exh. 26, and were pledged to Metro North on June 22, 1990, in substitution for the Acquisition stock held by Metro North. Pl.Exh. 27.[7]
*1466 On April 30, 1990, the Articles of Merger of Be-Mac Acquisition Company, Inc., into Be-Mac Transport Company, Inc., were filed with the Missouri Secretary of State. In the Articles of Merger, Ferguson was stated as the registered agent and president of the successor corporation, Be-Mac Transport Company, Inc.; and Steven Gula was stated as the corporate secretary of Be-Mac. Pl. Exh. 8.
In November 1990, the Central States, Southeast and Southwest Areas Pension Fund (Central States) sought to impose withdrawal liability against UST. On January 31, 1991, Be-Mac's attorney advised Central States that Be-Mac was "formerly a wholly owned subsidiary" of UST, which was purchased from UST in June 1989. Pl.Exh. 32. On February 13, 1991, that pension fund advised UST that Be-Mac was not under common ownership with UST and therefore was not responsible for UST's withdrawal liability. Pl.Exh. 33.
In 1992, Be-Mac's legal counsel made representations to Congress Financial concerning the ownership of Be-Mac stock in connection with Be-Mac's seeking authorization to acquire another corporation, defendant Falls City Industries, Inc., the parent corporation of defendant Middlewest Freightways, Inc. Pl.Exh. 16 at 90-91. On March 19 and May 1, 1992, Be-Mac's counsel advised Congress Financial's attorneys that Behrens, Gula, and Ferguson each owned 66,560.66 shares of the outstanding stock of Be-Mac, which represented almost all of the outstanding stock. Pl.Exh. 29 at 26-30; Pl.Exh. 30 at 10 ¶ H; Pl.Exh. 31.
On February 17, 1993, in connection with its bankruptcy, Be-Mac filed a schedule required by Fed.R.Bankr.Pro. 1007(a)(3), identifying Behrens, Gula, and Ferguson as each owning 66,560.66 shares of Be-Mac's stock. Pl.Exh. 38 at 17-18; Pl.Exh. 39-40. At Be-Mac's first meeting of creditors, Behrens and Gula testified that they (along with Ferguson) were Be-Mac's majority shareholders. Pl.Exh. 41 at 83-84. Gula prepared charts for Be-Mac's bankruptcy attorneys, which showed that Be-Mac was the "WHOLLY OWNED SUBSIDIARY" of Acquisition from June 1989 to May 1990. Pl.Exh. 38 at 56-57; Pl.Exh. 42. In February 1993, Be-Mac's counsel advised the attorney for Be-Mac's unsecured creditors' committee that UST sold Be-Mac's stock to Acquisition. Pl.Exh. 43 ¶ 6.
However, on June 15, 1993, after the instant judicial action was commenced, Be-Mac amended its list of equity security holders to substitute UST as the majority shareholder. Pl.Exh. 44; Pl.Exh. 38 at 25. On June 1 and 2, 1993, Be-Mac's counsel advised the attorney for the creditors' committee that Behrens, Gula, and Ferguson "are not, nor have they ever been, shareholders of Be-Mac." Pl.Exh. 43, Exhs. B and C.
In its 1989 federal tax return (after the stock sale but before the merger), Be-Mac identified Acquisition as owning in excess of 50% of the voting stock. Pl.Exh. 46.
On May 2, 1991, Coopers & Lybrand submitted a financial statement to Be-Mac's stockholders. This statement indicated that on June 16, 1989, Be-Mac Acquisition Company purchased all of the stock of Be-Mac Transport Company. Thereafter, the report stated, on March 6, 1990, Acquisition merged into Be-Mac. Pl.Exh. 48, Pl.Exh. 3, page 7, Note 1.
On September 16, 1993, six months after the commencement of this action, Messrs. Behrens, Gula, and Ferguson commenced an action in the United States District Court for the Western District of Missouri against UST and the Federal Deposit Insurance Corporation, the receiver of Metro North State Bank (Behrens suit). Plaintiffs in that action sought to rescind the June 16, 1989, Stock Purchase Agreement between UST and Acquisition. Pl.Exh. 49. The complaint alleged that Metro North refused to release UST's stock in Be-Mac, and UST misrepresented the status of approximately $2 million of Be-Mac's accounts payable. Plaintiffs alleged that this was a fraud discovered following the June 16, 1989, closing. Pl.Exh. 49 ¶¶ 12, 20.
Following service of process on the FDIC and its voluntary dismissal shortly thereafter, *1467 on October 15, 1993, the Behrens suit plaintiffs filed an amended complaint against UST. Pl.Exh. 50 ¶ 2; Pl.Exh. 51; Pl.Exh. 52. On February 8, 1994, a default judgment was entered against UST rescinding the June 16, 1989, contract. Pl.Exh. 14. The default judgment found that under the June 16, 1989, agreement, plaintiffs (through Be-Mac Acquisition Company, Inc.) were to receive 199,682 shares of the common stock of Be-Mac which were owned by UST; that neither Be-Mac Acquisition nor the plaintiffs ever received this stock which remained issued to UST; that the plaintiffs had executed certain bank loan guarantees for Be-Mac dated June 16, 1989, totalling $150,000; that the representations of UST that Be-Mac's accounts payable were either paid or current were false; and that the plaintiffs relied upon these misrepresentations in agreeing to purchase Be-Mac stock from UST. That court ordered the cancellation and rescission of the June 16, 1989, stock purchase agreement. Pl.Exh. 2.
During the times relevant to the instant judicial action, William Behrens, Steven Gula, and Robert Ferguson owned defendants Brotherhood Labor Leasing and MFI Leasing company, see Pl.Exh. 1 ¶¶ 13, 15; Pl.Exh. 2 ¶¶ 13, 15; and MFI owned all the stock of defendant Falls City, which in turn owned all the stock of defendant Middlewest Freightways, Inc. See Pl.Exh. 1 ¶¶ 17, 19; Pl.Exh. 2 ¶¶ 17, 19.
Be-Mac was a common carrier. See Pl. Exh. 8, October 17, 1962 Amendment to Articles of Incorporation. Brotherhood Labor Leasing was incorporated to conduct local pick-up and delivery service, MFI was a holding company organized to purchase Falls City stock, Falls City was a holding company for Middlewest's stock, and Middlewest was an interstate commerce carrier of common goods. Pl.Exh. 9 at 35, 39, 48, 49.

Discussion.
Plaintiffs seek summary judgment, arguing that defendants Brotherhood Labor Leasing, MFI Leasing Company, Inc., Falls City Industries, Inc., and Middlewest Freightways, Inc., were trades or businesses under common ownership with Be-Mac Transport Company, Inc., and thus the "single employer" under ERISA, 29 U.S.C. § 1301(b)(1), all jointly and severally liable for Be-Mac's withdrawal liability.
Defendants seek a summary judgment determination that they cannot be held liable as part of a controlled group with Be-Mac. They argue that Messrs. Gula, Ferguson, and Behrens never became the effective owners of Be-Mac, because (a) the original stock certificates of Be-Mac were never transferred from UST to Gula, Ferguson, and Behrens via Be-Mac Acquisition; and (b) the federal rescission judgment, based upon the alleged fraud of UST, negated any ownership interest of Be-Mac in Gula, Ferguson, and Behrens, and the corporate efficacy of any purported Be-Mac shareholder actions of Behrens, Ferguson, and Gula after June 16, 1989.

ERISA and MPPAA.
The Multiemployer Pension Plan Amendments Act of 1980 (MPPAA), 29 U.S.C. § 1381 et seq., allows a pension fund to recover withdrawal liability from all businesses "under common control" with the employer that has withdrawn from participating in a multi-employer pension fund. 29 U.S.C. § 1301(b)(1); Vaughn v. Sexton, 975 F.2d 498, 502 (8th Cir.1992), cert. denied, 507 U.S. 915, 113 S.Ct. 1268, 122 L.Ed.2d 664 (1993). The extension of withdrawal liability to the controlled group was designed to prevent employers, in multi-employer employee welfare plans, from avoiding or evading their obligations to contribute to the plans by dividing their operations and to prevent the remaining employers from having to contribute more than their share to cover for the withdrawn employer. Santa Fe Pacific Corp. v. Central States, Southeast and Southwest Areas Pension Fund, 22 F.3d 725, 727 (7th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 483, 130 L.Ed.2d 396 (1994).
The applicable Treasury Regulations[8] define types of controlled groups two of which relate to the facts of this case. Two or more business organizations comprise a "brothersister" *1468 group, if: (1) five or fewer persons own a "controlling interest" in both organizations; and (2) the same individuals exercise "effective control" over both organizations. 26 C.F.R. § 1.414(c)-2(c)(1). The other relevant controlled group is the "parent-subsidiary" group, which is comprised of a parent organization and its subsidiary if the parent owns a "controlling interest" (i.e., 80% of the voting stock) in it. 26 C.F.R. § 1.414(c)-2(b)(1). Controlling interest in a corporation is deemed to exist with ownership of at least 80% of the corporation's stock, see 26 U.S.C. § 1563(a)(1) and 26 C.F.R. §§ 1.414(c)-2(b)(2)(i)(A), and effective control is deemed to exist with ownership of more than 50% of the total combined voting power of all the classes of stock entitled to vote. 26 C.F.R. § 1.414(c)-2(c)(2)(i).
It is undisputed that during the relevant time period William Behrens, Steven Gula, and Robert Ferguson owned defendants Brotherhood Labor Leasing and MFI Leasing Company, and that MFI owned all of the stock of defendant Falls City, which in turn owned all of the stock of defendant Middlewest. Therefore, as plaintiffs allege, Brotherhood Labor Leasing and MFI are a brother-sister group which is joined with MFI, Falls City, and Middlewest, a parent-subsidiary/parent-subsidiary group. Be-Mac and the defendants were all "trades or businesses" within the meaning of 29 U.S.C. § 1301(b)(1). See Central States Pension Fund v. Personnel, Inc., 974 F.2d 789, 794 (7th Cir.1992).
The cardinal issue regarding the defendants' responsibility for Be-Mac's withdrawal liability vel non is whether Behrens, Gula, and Ferguson ever acquired a sufficient ownership interest in Be-Mac. If Behrens, Gula, and Ferguson ever owned in excess of 80% of Be-Mac stock, then Be-Mac and defendants became a controlled group. Defendants contend that the Be-Mac stock always was owned by UST and was held as collateral by Metro North, due to the default judgment in the Western District of Missouri, rescinding the agreement for the sale of the Be-Mac stock to Acquisition.
Plaintiffs argue that defendants' challenge to their status as an "employer," asserted by plaintiffs under the MPPAA, must be litigated before an arbitrator. Under the MPPAA, "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under section 1381 through 1399 of [title 29] shall be resolved through arbitration." 29 U.S.C. § 1401(a)(1). However, the question of "whether an entity ever became an employer under the MPPAA is an issue properly addressed by a district court prior to arbitration of any remaining issues...." Rheem Mfg. Co. v. Central States Southeast and Southwest Areas Pension Fund, 63 F.3d 703, 705 (8th Cir.1995), cert. denied, ___ U.S. ___, 116 S.Ct. 1016, 134 L.Ed.2d 96 (1996); see note 3, supra.
This court believes that summary judgment of withdrawal liability must be granted in favor of plaintiffs, because: (1) between June 16, 1989, and March 6, 1990, Acquisition owned Be-Mac until Congress Financial required Acquisition to merge into Be-Mac; and (2) following the merger, Behrens, Gula, and Ferguson each owned 66,560.56 shares of Be-Mac stock.
The undisputed evidence shows that Behrens, Gula, and Ferguson and their attorneys repeatedly made statements that Behrens, Gula, and Ferguson  directly or through their ownership of Acquisition  owned Be-Mac beginning on June 16, 1989. These statements were made to Congress Financial Company, the Central States Pension Fund, the Internal Revenue Service, the Missouri Department of Transportation and in connection with Be-Mac's bankruptcy. Behrens, Gula, and Ferguson acted as Be-Mac shareholders; they held meetings, approved corporate mergers, and elected themselves the corporate directors. Behrens, Gula, and Ferguson exercised the most significant right of a corporate shareholder, by voting the Be-Mac Stock. Pl.Exh. 63 ¶ 12.
Defendants argue that no sale of Be-Mac to Acquisition ever occurred and that they never became Be-Mac shareholders because at the June 16, 1989, closing, Metro North State Bank failed to deliver to Acquisition the certificates of the Be-Mac Stock which had been issued to UST. *1469 Therefore, they argue, there was no transfer of the stock from UST to Acquisition within the meaning of the Missouri Uniform Commercial Code, Mo.Rev.Stat. § 400.8-313. The court disagrees.
Under Missouri law, the endorsement of a certificate "does not constitute a transfer until delivery of the certificated security on which it appears...." See Mo. Rev.Stat. § 400.8-309; see also Pedersen v. Brantner, 503 S.W.2d 25, 27 (Mo.Ct.App. 1973). However, "[t]his section of the UCC governing the transfer of securities instruments, legal title of such instruments, and their negotiability, is not intended to `embrace the broad filed of equitable rights and interests and their methods of transfer.'" Crow v. Newspaper Dealer Supply, Inc., 603 F.Supp. 847, 851 (E.D.Mo.1985) (quoting Duncan v. Kelly, 435 S.W.2d 29, 33 (Mo.Ct. App.1968)). In Crow and Duncan, the courts held that equitable ownership of a share of stock can be transferred to a purchaser without the delivery of the certificate representing the shareholder's property interest. Thus, even if defendants are correct that Metro North failed to provide Behrens, Gula, and Ferguson with the stock certificates issued to UST, they still became the effective owners of the Be-Mac stock and Be-Mac entered in common control and under common ownership with defendants.
Even assuming the transfer of the Be-Mac stock ownership from UST to Acquisition was ineffective as a matter of Missouri law, Behrens, Gula, and Ferguson are nevertheless deemed the owners of Be-Mac under federal law. "A company ... can achieve control group status without possessing actual ownership." Board of Trustees of Trucking Employees Pension Fund v. Centra, 983 F.2d 495, 502 (3d Cir.1992). In Centra, employer Mason-Dixon ceased making contributions to the fund in 1984 due to insolvency. In 1983, Centra executed a stock purchase agreement with the shareholders of Mason-Dixon. The sale was contingent upon approval by certain government agencies; the sale was finalized in 1985. The district court held that Centra controlled Mason-Dixon before the 1984 withdrawal date and the court of appeals agreed. 983 F.2d at 501-02. The court of appeals held that ownership of stock is deemed to exist when there is an option to purchase the stock. 983 F.2d at 502. See 26 U.S.C. §§ 1563(d)(1), 1563(e)(1); 26 C.F.R. § 1.414(c)-4(b)(1).
"An option contract exists when a promise (1) meets the requirements for contract formation; and (2) limits the promisor's power to revoke an offer." Board of Trustees of Trucking Employees Pension Fund v. Centra, 983 F.2d at 502; see IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118, 124 (3d Cir.1986); Restatement (Second) of Contracts § 25 (1981). The Stock Purchase Agreement between UST and Acquisition satisfied all requirements for the formation of a contract. Further, under Missouri law, on June 16, 1989, at the closing, Acquisition acquired the enforceable right to require the transfer of the Be-Mac stock to it under the terms of the executed agreements. See V.A.M.S. § 400.8-309 Comment 2; § 400.8-314(2). For these reasons, on June 16, 1989, Acquisition became the equitable owner of the Be-Mac stock. On June 1, 1990, Messrs. Gula, Ferguson, and Behrens acquired the stock of Be-Mac in the merger of Be-Mac and Acquisition. Upon this stock ownership, Be-Mac became a member of the controlled group which included the defendants and the defendants thus became liable for Be-Mac's withdrawal liability.
Defendants argue that the rescission judgment in the Western District of Missouri sets aside any responsibility for Be-Mac's MPPAA withdrawal liability. Under Missouri law, rescission is a judicial remedy that is available for the victim of fraud in the inducement to enter a contract. Western Fireproofing Co. v. W.R. Grace & Co., 896 F.2d 286, 290 (8th Cir.1990); Stewart v. C & C Excavating & Construction Co., 877 F.2d 711, 714 (8th Cir.1989); Slater v. KFC Corp., 621 F.2d 932, 935 (8th Cir.1980); Signature Pool & Court, a Div. of Classic Pools, Inc. v. City of Manchester, 743 S.W.2d 538, 541 (Mo.Ct.App.1987); DeFabio v. Mackey, 493 S.W.2d 355, 360 (Mo.Ct.App.1973).
The rescission judgment placed the affected parties in their pre-transaction positions. *1470 Western Fireproofing Co. v. W.R. Grace & Co., 896 F.2d at 290; Slater v. KFC Corp., 621 F.2d at 935.
Rescission of a contract extinguishes it as effectually as if it had never been made, and restores the parties to the positions they occupied before the contract was executed.
Williams v. AgriBank, FCB, 972 F.2d 962, 966 (8th Cir.1992) (quoting Alexander v. Link's Landing, Inc., 814 S.W.2d 614, 620 (Mo.Ct.App.1991)). Therefore, the parties to that lawsuit were placed in the same position they were in prior to executing the stock sale transaction. As between UST and the plaintiffs in that suit, UST returned to being the majority shareholder of Be-Mac.
Defendants further argue that the rescission judgment is binding upon plaintiffs in this suit because of the doctrines of claim preclusion and issue preclusion. The court disagrees. These doctrines are inapplicable to the circumstances of this action, because the plaintiffs in this lawsuit or their privies were not parties in that lawsuit. See Martin v. Wilks, 490 U.S. 755, 761-62 & n. 2, 109 S.Ct. 2180, 2184 & n. 2, 104 L.Ed.2d 835, reh'g denied, 492 U.S. 932, 110 S.Ct. 11, 106 L.Ed.2d 626 (1989); Board of Trustees of Trucking Employees of North Jersey Welfare Fund v. Centra, 983 F.2d 495, 504-05 (3d Cir.1992).
Defendants argue that plaintiffs had knowledge of the rescission judgment immediately after the judgment was issued and allowed the one-year term of Fed.R.Civ.P. 60(b) to run without contesting the judgment. This argument is without merit. Although the plaintiffs in that lawsuit might have sought to join the instant plaintiffs, see Fed. R.Civ.P. 18-20, and although the plaintiffs herein might have been able to seek intervention in that lawsuit, see Fed.R.Civ.P. 24, the instant plaintiffs were not required to attempt to enter that suit. See Martin v. Wilks, 490 U.S. at 763-64, 109 S.Ct. at 2185-86.
Defendants' invocation of Celotex Corp. v. Edwards, 514 U.S. 300, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995); Montana v. United States, 440 U.S. 147, 99 S.Ct. 970, 59 L.Ed.2d 210 (1979); and O'Dell v. McSpadden, 780 F.Supp. 639 (E.D.Mo.1991), aff'd, 994 F.2d 843 (8th Cir.), cert. denied, 510 U.S. 895, 114 S.Ct. 260, 126 L.Ed.2d 212 (1993), is to no avail. In Celotex Corp. and O'Dell, the courts never denigrated the requirement of either issue or claim preclusion that a party to be held bound by the earlier judgment must have been, or its privies must have been, a party in the earlier lawsuit. See Celotex Corp., 514 U.S. at ___ _ ___, 115 S.Ct. at 1499-1501; O'Dell v. McSpadden, 780 F.Supp. at 643. In Montana v. United States, the Supreme Court bound the United States to the outcome of a prior suit because, although it was not a formal party to that action, it controlled the actions of one of the parties. 440 U.S. at 154-55, 99 S.Ct. at 974-75. This court concludes that the rescission judgment in the Western District of Missouri binds the parties to that suit, but it may not be used by defendants in this suit to preclude plaintiffs from asserting defendants' employer status under the MPPAA.[9]
*1471 Because of the determinations of this court set forth above, the court believes that the arguments of the parties over the efficacy of the Be-Mac stock certificates, dated June 1, 1990, which the FDIC produced to plaintiffs are moot.
Similarly, plaintiffs' arguments that the rescission judgment may be disregarded because the evidence plaintiffs offered in that action was not entirely accurate and that that suit was a transaction for avoiding or evading withdrawal liability, see 29 U.S.C. § 1392(c), see also Santa Fe Pacific Corp. v. Central States Southeast and Southwest Areas Pension Fund, 22 F.3d 725, 727 (7th Cir.), cert. denied, ___ U.S. ___, 115 S.Ct. 483, 130 L.Ed.2d 396 (1994), are irrelevant to this action. Whether or not Be-Mac Acquisition Company and thereafter Messrs. Gula, Ferguson, and Behrens were the legal owners of the Be-Mac stock is not dispositive of this action. The interest in the Be-Mac stock acquired by Acquisition, which was at least an equitable interest, and which was thereafter acquired by Gula, Ferguson, and Behrens, is a sufficient basis for concluding that Be-Mac entered the controlled group with the defendants.
This court concludes that the relevant dispositive facts are without dispute and that plaintiffs are entitled to summary judgment as a matter of law. Plaintiffs are entitled to a determination that defendants are a single employer jointly and severally liable for the withdrawal liability of Be-Mac Transport Company. Defendants shall be required, within 60 days of the date of the judgment order issued herewith, to pay to plaintiffs the interim payments demanded by the plaintiffs in the amended demand. See 29 U.S.C. § 1399(c)(2). Any other disputes (except the efficacy of the rescission judgment is not one) between the parties in this action under the MPPAA, e.g. the amount of the withdrawal liability, will be ordered submitted to an arbitrator under 29 U.S.C. § 1401.
An appropriate judgment order is issued herewith:
(1) denying as moot the motion of the plaintiffs to compel discovery from attorney-witnesses Taylor and Helt (Doc. No. 119);
(2) granting the motion of plaintiffs to correct a deposition transcript (Doc. No. 120) because it was unopposed;
(3) granting the motion of plaintiffs to dismiss the proposed state law counterclaims (Doc. No. 129);
(4) granting the motion of the plaintiffs to dismiss the proposed RICO counterclaim (Doc. No. 133);
(5) denying the motion of the defendants for leave to amend their counterclaims (Doc. No. 136);
(6) denying the motion of the defendants for summary judgment; and
(7) granting the motion of the plaintiffs for summary judgment.
NOTES
[1] Defendants' proposed counterclaims, attached as an exhibit to their motion for leave to file, are unsigned.
[2] Under Missouri law, prima facie tort liability arises from the commission of an intentional, lawful act by the claim defendant, committed with an intent to injure the claimant, which results in injury to the claimant, without sufficient justification for the act. See Dowd v. General Motors Acceptance Corp., 685 S.W.2d 868, 872 (Mo.Ct.App.1984). The doctrine of prima facie tort applies only where the alleged facts do not provide a basis for liability under any other established theory of tort recovery. Tufts v. Madesco Inv. Corp., 524 F.Supp. 484, 486 (E.D.Mo. 1981); Bandag of Springfield, Inc. v. Bandag, Inc., 662 S.W.2d 546, 554 (Mo.Ct.App.1983).
[3] The threshold issue of defendants' alleged status as an "employer" responsible for withdrawal liability is, however, properly one for the court and not the arbitrator. E.g., Central States, Southeast and Southwest Areas Pension Fund v. Houston Pipe Line Co., 713 F.Supp. 1527, 1531 (N.D.Ill.1989).
[4] Defendants appear to allege that the plaintiff Fund also has sustained a loss of its assets. Defendants' standing to sue on behalf of the Fund is not clearly alleged.
[5] Plaintiffs deposed the attorneys who represented Metro North State Bank at the closing. They testified that Acquisition was to be issued a stock certificate which represented the Be-Mac stock formerly owned by UST, that Metro North's lien was to continue to attach to the new certificate, Pl.Exh. 14 at 22, and that the transaction took place in accordance with the closing documents. Pl.Exh. 15 at 28-29.

Defendants' argument, that at the closing Metro North refused the request to produce the UST-owned certificates of Be-Mac stock, does not gainsay the evidenced execution of the transaction documents by Gula, Ferguson, and Behrens in spite of the failure to produce the UST stock certificates. See Def.Exh. 10; Def.Exh. 11 ¶ 15.
[6] Congress Financial's files contained an undated letter from Robert Ferguson which stated that "[t]he final and most recent change in Be-Mac Transport's history has been the purchase of Be-Mac stock from U.S. Truck Lines by the existing officers of Be-Mac which was accomplished on June 16, 1989." Pl.Exh. 22.
[7] The Federal Deposit Insurance Corporation, as successor for the failed Metro North State Bank, was subpoenaed to produce all Be-Mac stock certificates issued to UST, Acquisition or Behrens, Gula and Ferguson and pledged to Metro North to secure loans to UST, ADM Acquisition or Be-Mac. A search of the agency records revealed that the only original stock certificates it has are those issued to Behrens, Gula, and Ferguson. While it has only copies of the certificates issued to Acquisition, it has none of the certificates issued to UST. Pl.Exh. 28.
[8] See 29 U.S.C. § 1301(b)(1).
[9] Defendants refer the court to Central Transport, Inc. v. Central States, Southeast and Southwest Area Pension Fund, 640 F.Supp. 56 (E.D.Tenn. 1986), aff'd, 816 F.2d 678 (6th Cir.), cert. denied, 484 U.S. 926, 108 S.Ct. 290, 98 L.Ed.2d 250 (1987). In that case, one of the alleged members of the controlled group entered into an agreement to purchase the withdrawing company's stock. The agreement was, however, conditioned upon the final approval of the sale by the Interstate Commerce Commission and by various state regulatory agencies. ICC approval was received on March 7, 1984. The issue before the court was whether the alleged purchaser of the stock was a member of the controlled group as of December 31, 1983, by virtue of the stock purchase agreement. The Pension Fund in that action alleged that the purchaser had constructive ownership of the stock based upon the stock purchase agreement and argued that the stock purchase agreement created an option to purchase the stock. The court examined 26 U.S.C. § 1563(e)(1), which defines options to purchase stock:

Options.  If any person has an option to acquire stock, such stock shall be considered as owned by such person. For purposes of this paragraph, an option to acquire such an option, and each one of the series of such options, shall be considered as an option to acquire such stock.
The court found that the stock purchase agreement did not create an option because certain contingencies existed over which the prospective purchaser had no control. The court held that there was no constructive ownership of the company, and consequently, there was no resulting withdrawal liability. In the case at bar, no such condition to the transfer of ownership to Acquisition existed.
A similar issue was addressed in Pension Benefit Guaranty Corp. v. Dickens, 719 F.2d 146 (6th Cir.1983). In Dickens, Heinicke Instruments Co. attempted to purchase the corporate parent of the withdrawing entity; however, the withdrawing entity was already in Chapter 11 bankruptcy. As a result, the purchase could not be consummated without approval of the bankruptcy court. The court found that the purchase was merely an "attempted purchase." In the case at bar, no such pre-condition attended the consummation of the transaction on June 18, 1989.